1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   TOMMY GENE DANIELS,                        No.  2:16-cv-3025 MCE AC P

12                    Petitioner,

13        v.                                     ORDER AND FINDINGS AND
                                                 RECOMMENDATIONS
14   SHAWN HATTON,

15                    Respondent.

16

17        Petitioner is a California state prisoner proceeding through counsel with an application for

18   a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The action proceeds on a petition which

19   challenges petitioner's 2011 conviction for eleven counts of lewd or lascivious acts with a child

20   under fourteen years old.  ECF No. 1.  Respondent has answered, ECF No. 14, and petitioner has

21   filed a traverse, ECF No. 26.

22                                  BACKGROUND

23   I.      Proceedings In the Trial Court

24        A.  Preliminary Proceedings

25        Petitioner was charged in Sacramento County Superior Court with twelve counts of lewd

26   or lascivious acts with a child under fourteen years old (Cal. Penal Code § 288(a)).  2 CT 512-18

27   ////

28   ////

1

(Second Amended Information).[1]  The pleading alleged an enhancement for multiple victims under California Penal Code § 667.61(e)(5).  2 CT 518.

Petitioner pleaded not guilty, and the case proceeded to jury trial.

B.  The Evidence Presented at Trial

The jury heard evidence of the following facts.[2]

1.  Prosecution's Case-in-Chief

Petitioner and his wife Brenda Daniels operated a daycare in their home, even after their license was revoked in 2003.  Around 2002, they began also providing "respite care" by taking in other people's adopted children with behavioral problems.[3]  They also provided foster care under certification by a licensed agency, Positive Option, until their certification was revoked in 2003.  The victims were in daycare or respite care.

a.  Victim A.G. – Counts One and Two

A.G. is the victim that first reported the abuse at petitioner's home.  Age twelve at trial, she went to daycare at petitioner's home between 2002 and 2005.  A.G. and her parents testified to an incident on July 5, 2005, when A.G. was six years old.

A.G. testified she was napping behind a couch.  Someone moved her to a bed in a bedroom.  The next thing she remembered was petitioner shaking her shoulders to wake her up.  She did not want to get up, so she pretended she was still asleep.  Petitioner continued shaking her shoulders and then placed his finger in her vagina and moved his finger around.  A.G. moved away, still pretending to be asleep, but petitioner again placed his finger in her vagina and moved his finger around.  Petitioner left the room.  A.G.'s vagina hurt.  On cross-examination, A.G. admitted she did not see petitioner, because she did not open her eyes.  But she believed it was

---

[1]  "CT" refers to the Clerk's Transcript on Appeal, Volumes 1 through 3 (Lodged Docs. 1-4). The state court record also includes a Supplemental CT (Lodged Doc. 5), and Augmented CT in two volumes (Lodged Docs. 6-7).

[2]  The following summary is adapted from the opinion of the California Court of Appeal, Lodged Doc. 19; 2015 WL 3901980; 2015 Cal. App. Unpub. LEXIS 4498.  The undersigned has independently reviewed the trial transcripts (Lodged Docs. 8-15) and finds this summary to be accurate except as noted.

[3]  Respite care was described as temporary live-in care for these children to give the adoptive parents a respite.

petitioner because of the way the finger felt.  She had felt petitioner's hands before; she described his hands as "kind of hard and big like a man's."

AG's father testified that when A.G. came home that day, she told him that petitioner had touched her bottom and vagina.  Her father told her mother.  Her mother testified she asked A.G. what happened.  A.G. said she had been taking a nap in a bedroom, when petitioner came into the room, called her name, put his hand down her pants, stuck his finger in her vagina (a word with which A.G. was familiar), and moved his finger.  A.G. said she rolled over and pretended to be asleep, and petitioner left the room.  A.G.'s parents phoned the Danielses' home and left a message for Brenda to call them.  The parents then contacted a doctor, who contacted the police.

A.G.'s mother testified she left her children with the Danielses even after she learned their license was revoked, because it was her "understanding" the revocation was merely for "administrative stuff."  Petitioner's wife was the primary caregiver, but petitioner sometimes helped, as did their two older daughters.

Physician assistant Ana Ross, who had special training in child sex abuse, observed several areas of redness in A.G.'s vaginal area.  But the examination could not prove or disabuse sexual abuse.  A lack of proper hygiene could also cause irritation.

The jury saw a videotaped interview of A.G. at the Special Assault Forensic Evaluation (SAFE) Center.  A.G. said she was sleeping, and petitioner put his finger in her vagina and moved it around, and then she woke up.  While his finger was in her vagina, she turned away from him, and his finger came out, but then he put it in again and moved his finger around in her vagina.  When asked what it means to be asleep, she said, "It means that your eyes [are] closed and you're not really moving."  When petitioner did this, she was "kind of asleep and awake," "in the middle."  When his finger went in, she thought, "'oh what's that,'" and heard petitioner's voice.

////

////

////

////

////

3

1          b.   <u>Victim K.N. – Counts Three, Four, and Five</u>

2          K.N., age fifteen at the time of trial, lived in petitioner's home for a year or two but did

3   not remember how old she was at that time.[4]  She had therapy sessions there with a therapist,

4   Mell LaValley,[5] with petitioner present.  Three or four times a week, petitioner made K.N. touch

5   herself in the master bathroom.  She thought she was eight or nine years old the first time it

6   happened.  Petitioner's wife had taken most of the children to a circus or fair.  Petitioner took

7   K.N. into the bathroom, told her to pull down her pants, and lie on her back on the floor.  He got

8   out some "medicine stuff" and told her to take some in her hands and rub her vagina.  She

9   hesitated.  He took her hand in his hand and moved her hand back and forth, touching her vagina.

10  After awhile, he let her leave the room.

11         Many times, K.N. was asleep in the living room and awoke to find petitioner touching her

12  vagina.  She pretended she was still asleep but peeked and saw petitioner and heard his heavy

13  breathing.  After a while, petitioner would stop.

14         K.N. felt she could not say "no" to petitioner because he was bigger, she felt intimidated

15  by him, and she was scared.

16         Sometime during or before 2004, K.N. told her mother and/or Brenda that petitioner had

17  touched her inappropriately, and they then told therapist Mell LaValley, who did not believe it.[6]

18  Although K.N.'s mother became suspicious of petitioner, she had K.N. return to petitioner's

19  home for a short time because (according to K.N.) her mother believed LaValley that K.N. had

20  lied.

21         K.N. admitted at trial that lying was one of her problems.  While at the Danielses' home,

22  she took medications every day but did not know the names of the medications.  If her behavior

23

24  _____

    [4]  Her sister H.N. was around eight or nine years old when they lived in petitioner's home, which
25  would have made K.N. six or seven at that time.
    [5]  Mell LaValley was a licensed marriage and family therapist who counseled one of the
26  Danielses' children, then used the Danielses' home for therapy sessions with her own clients, then
    referred those clients to the Danielses' home for respite care, and continued to counsel them at the
27  Danielses' home.
    [6]  LaValley testified that she did not make the mandatory report to the police because K.N. later
28  recanted.

                                                   4

1  was not right, they would change the medications.

2  After K.N. left petitioner's home permanently, she learned from her mother about A.G.'s

3  accusations against petitioner.  A year or two later, K.N. reported her abuse to her present

4  guardian, Carla DeRose.

5  The incidents were reported to the police in 2008.  A videotaped SAFE interview of K.N.,

6  then age eleven, was played for the jury.

7  K.N.'s mother testified K.N. had behavioral problems with frequent lying, and her sister

8  H.N. liked to get others in trouble and stole.  While the girls were in respite care with petitioner,

9  they were seeing a psychiatrist who prescribed medications for them.  The mother said Brenda

10  told her not to believe K.N.'s earlier accusation against petitioner.

11  c.  Victim H.N. – Counts Six and Seven

12  H.N., K.N.'s older sister, was age seventeen at the time of trial and testified she lived at

13  petitioner home for about a year when she was eight or nine years old.  She said petitioner was

14  charming and polite when she first arrived, but he changed thereafter.  He yelled at his wife a lot,

15  cussed really loud, and seemed like a bully.

16  Petitioner took her into the master bathroom, had her lie naked on the floor, told her to

17  take a Vaseline-like substance, which he said was for therapy, and with his hand moved her hand

18  up and down over her vagina.  He then told her to continue while he rubbed her chest.  He had her

19  do this again on other occasions.  It happened a lot, but she did not remember how many times.

20  She did not initially tell her mother, because she was afraid of petitioner.  She said that while

21  petitioner was not mean to her, he was mean to his own children and to H.B.1.[7]  She eventually

22  told her mother after she stopped living at petitioner's home and learned the same had happened

23  to K.N.

24  On cross-examination, H.N. said she was sent to petitioner's home because she was

25  "throwing fits," and her mother could not control her behavior.  H.N. took medication to help

26  control behavior while she lived at petitioner's home.  When the medications did not work, others

27

28  [7] Two sisters had the same initials and were referred to as H.B.1 and H.B.2.  H.B.1 was the older of the two siblings.

5

1   were substituted.  At petitioner's home, H.N. had regular therapy sessions with Mell LaValley, in

2   the presence of H.N.'s mother and either petitioner or his wife.  H.N. admitted that one of her

3   behavioral problems was that she lied and made up stories.

4         After leaving petitioner's home, H.N. was sent to a Baptist school in Mississippi for a year

5   and then she returned home.  She was still having behavioral problems and was sent to live with

6   her current guardian.

7         H.N. was aware that H.B.1 and H.B.2 made allegations against petitioner.

8               d.   Victim H.B.1 – Counts Eight, Nine and Ten

9         H.B.1, age fourteen at trial, testified she takes Seroquel at night for attention deficit

10   disorder.  Her adoptive parents sent her to live in the Danielses' home when she was five and a

11   half years old, where she said there was a lot of physical and sexual abuse.  She was terrified of

12   petitioner, who yelled in her face during therapy and gripped her arms really tight.  She remarked

13   that petitioner "was really big and I couldn't do anything."  He wanted her to say she was mad

14   when she was not mad.  But she later testified she was always mad, "raging inside."  She took

15   medications that made her act weird.

16         H.B.1 testified that when she was in the bathroom, petitioner would walk in on her, close

17   the door, have her lie on the floor after removing her clothes, and touch her skin with his hands.

18   She said she "shut down" most of the time; she tried to block it out by not thinking about it and

19   did not let herself remember.

20         H.B.1 became nonresponsive on direct examination and said she was uncomfortable

21   talking about this in the presence of so many strangers.  She eventually acknowledged petitioner

22   touched her vagina.  It happened more than once, but she did not keep track.

23         When asked if a touching occurred around her sixth birthday, H.B.1 said, "I didn't

24   remember, myself, but [my sister] told me that she remembered—."  The trial court sustained a

25   hearsay objection.  H.B.1 then testified that she remembered being on petitioner's waterbed

26   around her sixth birthday.  She would not respond to the prosecutor's questions about what

27   happened.

28   ////

In a video of the SAFE interview played for the jury, H.B.1 told the interviewer that the day before her sixth birthday, she was lying on petitioner's waterbed, watching the fish in an aquarium,[8] while other people were occupied elsewhere in the house.  Petitioner was pacing back and forth at the end of the bed.  He pulled off her pants and underpants.  She closed her eyes tight. She felt him put his finger in her.  When petitioner was done, H.B.1 got dressed, and petitioner said, "That's your surprise birthday present."

H.B.1 testified the respite care children were not allowed to talk in their bedroom.  If they did, they would get a cold shower and have to sleep in wet clothes.  If they got in trouble, they would have to do headstands or walk on their knees as punishment.

H.B.1 did not tell her parents when they came to visit because petitioner or someone from his family was always there, he had threatened that she better not tell anyone, and she thought her parents had sent her there for punishment.

H.B.1 disclosed the abuse to her new caretaker, Carla DeRose, who had already heard about it from other children.  H.B.1 testified that Carla told her petitioner had abused 150 girls and there was proof on his computer.

H.B.1 testified petitioner made her have sex twice with a boy named John who lived in the house.

Once H.B.1 sustained a large "five-star" handprint mark.  She remembered telling the interviewer about it, but she did not remember petitioner causing it.  She said she remembered "being hit with objects, like scratchers and stuff."  H.B.1 and H.B.2's adoptive mother testified that in December 2004, she felt an urgent need to bring the girls home.  She retrieved them and discovered a black-and-blue bruise in the shape of a large handprint on H.B.1's left leg.

H.N. told H.B.1 that petitioner forced H.B.1 to act out sexually with other female children at the house, but H.B.1 did not remember that and did not know if this was true or not.  H.B.1 said petitioner took pictures of her.

////

---

[8]  Two of the other victims did not remember seeing fish or an aquarium in petitioner's bedroom.

1  Pediatrician Dr. Angela Rosas examined H.B.1.  The examination was completely normal,

2  which was inconclusive as to whether sexual abuse had occurred.

3        e.  <u>Victim H.B.2 – Counts 11 and 12</u>

4  H.B.2, age thirteen at trial, is one year younger than her sister H.B.1.  H.B.2 testified to

5  events that occurred when she was five years old and lived at petitioner's home.  When the

6  prosecutor asked if anything inappropriate happened there, she said, "I know he [petitioner] made

7  us touch ourselves."  The prosecutor asked, "And so how would . . . that happen?"  She said,

8  "There was I think the office or—I think—one second."  After a long pause, she started crying

9  and said, "I can't do this."  When she regained her composure, H.B.2 testified that on multiple

10  occasions (more than once a week), petitioner made her touch herself in the office, or a room that

11  had computers, chairs, and desks.  There was an attached bathroom where petitioner retrieved

12  Vaseline.  Petitioner locked the office door, had H.B.1 and H.B.2 get undressed and lie back on

13  the carpet.  He gave them Vaseline to put on their hands and told them to touch themselves.

14  H.B.2 touched her front private part with her fingers.  When petitioner told them to stop, they got

15  dressed and resumed whatever they had been doing.

16  Petitioner said not to tell anyone, and H.B.2 did not tell her parents because she was

17  scared.  She eventually told her foster mother Cheryl and then told her parents.

18  On cross-examination, H.B.2 said she was currently taking medication, Seroquel XR, and

19  had been for a little over a year, to help calm her down and make her feel "safer after a while."

20        f.  <u>Description of the Behavioral Problems of H.B.1 and H.B.2 by Their Adoptive</u>
21  <u>Mother</u>

22  The adoptive mother of H.B.1 and H.B.2 testified that H.B.1 and H.B.2 developed

23  behavior problems and were sent to live at petitioner's home through referral from LaValley.

24  H.B.1 was placed there in August 2003, and H.B.2 went in November 2003.  The adoptive

25  parents paid petitioner over $30,000 and paid LaValley over $10,000 for therapy.  The mother put

26  a video monitor in the room where the girls slept.  She was aware that a house rule was that the

27  children would not be fed if they disobeyed; they would have to wait for the next meal to get any

28  food.  The girls' mother knew little about "therapeutic homes" and trusted that the Danielses

8

1  knew what they were doing.

2      The mother acknowledged H.B.1 and H.B.2 both had a tendency to lie.  H.B.1 was

3  prescribed various medications, e.g., Risperdal, Abilify, and Focalin, while at the Danielses'

4  home, which was changed based on a psychiatrist's recommendations.

5      For the five years after she took H.B.1 and H.B.2 out of the Danielses' home, the girls

6  lived with their adoptive parents, but they continued to struggle with behavioral problems and

7  were eventually placed in separate foster homes, where the girls for the first time disclosed the

8  sexual abuse.

9          g.   Prosecution Expert on Child Sexual Abuse Accommodation Syndrome

10     Licensed psychologist Dr. Anthony Urquiza testified that Child Sexual Abuse

11  Accommodation Syndrome (CSAAS) is not used to determine whether a child has been sexually

12  abused, but rather as an effort to dispel any myths, misunderstandings, or misconceptions about

13  how such a child should react or behave.  The doctor acknowledged CSAAS is more of a pattern

14  than a "syndrome."  It has five parts: (1) secrecy; (2) helplessness; (3) entrapment and

15  accommodation; (4) delayed and unconvincing disclosure; and (5) retraction of an allegation of

16  abuse.

17     Dr. Urquiza began by explaining what he called a fundamental characteristic of child

18  sexual abuse.  Most sexually abused children are abused by somebody with whom they have an

19  on-going relationship—somebody who is bigger, stronger, and more powerful than the child.

20     The secrecy component explains why children do not disclose abuse.  Sometimes overt

21  threats are made, e.g., if you tell, something bad will happen to you, or if you tell, I'll hurt you.

22  In response, the child does not disclose.  Sometimes, there are no overt threats, but rather the

23  child does not disclose because the child is intimidated by the bigger, stronger perpetrator.

24  Sometimes a coercive strategy is used.  Special gifts are given or there is a positive relationship

25  between the child and the perpetrator the child wants to maintain.  Or the child is coerced by

26  misinformation, e.g., suggesting to the child that this is normal behavior.  Sometimes children do

27  not disclose because they fear bad things may happen in their life, they might get in trouble or

28  they will not be believed, so in the child's mind it is smarter not to disclose.

1      The helplessness component of CSAAS explains that it is unreasonable to expect a child

2  to keep himself or herself safe from an abuser who is bigger, stronger, and has on-going access to

3  the child.  The child feels that if the person who is responsible for protecting her is the one

4  abusing her, then there is not anything the child can do.  The abuser has the control and power.

5      In discussing entrapment and accommodation, Dr. Urquiza explained since there is

6  nothing the child can do about the abuse, the child learns to cope with their feelings of shame,

7  disgust, fear, embarrassment, and humiliation.  One way to manage those feelings is by

8  disassociation or shutting those feelings down.  While some children break down and cry, others

9  are successful in disassociating or suppressing their feelings without showing distress.  And

10  during the act of abuse, some children disengage themselves, essentially go numb, lie still, or

11  pretend to be asleep as a way to cope.  As an example, Dr. Urquiza discussed a patient who said

12  he stared at a tree outside of his bedroom window every time he was sexually abused.

13      As for delayed disclosure, Dr. Urquiza testified that it is related to secrecy.  "A lot of

14  people have the misperception that if you're abused you're going to tell somebody right away,"

15  but that "doesn't happen very often."  Most children delay disclosing sexual abuse, and the closer

16  the relationship or access the perpetrator has to the child, the more likely it is that the delay will

17  be longer.  Regarding unconvincing disclosure, Dr. Urquiza explained that sometimes the

18  disclosure is a process beginning with a vague, nondescript disclosure and then the child will say

19  more if the child feels supported.  But when there is more information given in subsequent

20  versions, the information looks unconvincing, as if the story is made-up.  Also, children have a

21  harder time estimating frequency and duration of events or recalling specific dates and this is

22  recognized as part of the unconvincing disclosure component of CSAAS.

23      Finally, retraction does not mean the child lied, because an estimated 20 to 25 percent of

24  children who disclose sexual abuse recant.  Children recant because pressure is imposed upon

25  them to keep quiet or take back the allegation.  "Maybe mom says . . . if you keep this up then

26  Uncle Bob will go to jail."

27      According to Dr. Urquiza, false accusations of sexual abuse make up only one to six

28  percent of known cases.  Most false accusations come not from the child, but from a parent in a

1  custody dispute.

2        Dr. Urquiza testified that CSAAS is consistent with his experience in his practice and the

3  research literature.  He uses CSAAS to train the clinicians in an internship program.  He has

4  frequently treated child sexual abuse victims who have been on medications for psychiatric

5  disorders.  The CSAAS characteristics are the same for such children.  He opined that there is no

6  difference between children who are on medications and children who are not.

7        The doctor testified that he has never interviewed or even met the victims in this case.

8  Nor has he read any police reports related to the case.  And he said that it is inappropriate to use

9  CSAAS to determine whether a child had, in fact, been sexually abused.

10            2.  Defense Case

11                a.  Petitioner's Wife – Brenda Daniels

12        Brenda testified she and petitioner have one biological child of their own, and they have

13  adopted several children with behavior problems.  Their social worker referred them to therapist

14  Mell LaValley.

15        The Danielses also provided foster care.  They were certified by and worked under the

16  umbrella of a foster agency, Positive Option.  The Danielses also provided "respite care," for

17  which they were paid, and received referrals from LaValley, who had counseled the Danielses

18  with their own children and suggested the respite care idea.

19        Brenda testified the victims had issues with lying and manipulation.  She said they were

20  "crazy liars," meaning they would make blatantly false statements such as doing something in

21  front of the adults and then denying they did it.  One threw her own feces at the living room wall

22  and piano, and another was prone to "stir up the pot."  Brenda said she never saw any

23  inappropriate conduct by petitioner and if she had, she would have called the police.  Petitioner

24  spanked their own child and adoptive children but never hit the respite children.

25        Brenda said she did not report K.N.'s first allegation of molest because K.N. recanted and

26  said it was not true and she had just been mad at petitioner.

27        Brenda acknowledged that their daycare license and foster care certification were revoked

28  in 2003.  Additionally, their application to obtain their own foster care license was denied.  When

1  asked whether there had also been an order excluding petitioner from employment in or contact

2  with clients of a licensed community care facility, she said, "I believe so.  I really don't

3  remember."

4             b.  <u>The Therapist – Mell LaValley</u>

5         LaValley testified that she is a licensed marriage and family therapist and works mainly

6  with adopted children and their families.  After counseling the Danielses' own children, LaValley

7  asked if she could use their home for sessions with H.B.1 and H.B.2 who lived over three and a

8  half hours away.  She referred many children to the Danielses' home for respite care, including

9  four of the victims in this case.  H.N. started respite care in December 2002; K.N. in the summer

10  of 2003; H.B.1 in August 2003; and H.B.2 in November 2003.

11         LaValley testified she did not receive a "kickback" but rather made the referrals in the

12  children's best interests.  LaValley conducted her therapy sessions with those children at the

13  Danielses' home, where she spent about six hours a week.  LaValley's "going rate" for therapy

14  was $80 per hour.  LaValley had petitioner or his wife sit in on therapy sessions with the respite

15  care children, because she viewed them as sort of "cotherapists."

16         LaValley was aware that the Danielses' daycare license and foster certification were

17  revoked in 2003, but she kept referring children to the Danielses for respite care until 2005 when

18  the Danielses stopped taking in children.  According to LaValley, respite care did not require a

19  license.  It was her "understanding" that the only reason for the license revocation was that

20  petitioner supposedly made a comment, "'over my dead body,'" when told the foster agency was

21  going to remove a foster child from his home.  However, her information about the revocation

22  came from the Danielses.  LaValley testified she did not remember if she disclosed the revocation

23  when she recommended the Danielses to parents, but she believed parents did their own

24  screening.  She indicated she would not have kept referring children or working in petitioner's

25  home had she known the revocation order also excluded petitioner from working in any licensed

26  community care facility or having contact with clients of a licensed community care facility.

27         From her own experiences in the Danielses' home, LaValley viewed them as good people

28  and had "absolutely no concerns" about the care children received.  According to LaValley, the

children never appeared afraid or upset.  There are not a lot of people willing to provide respite care.  LaValley testified the four victims in this case were liars and manipulators and were seeing a psychiatrist who prescribed medications for them.  LaValley said K.N. lied about watching R-rated movies to try to get the Danielses in trouble.  H.N. took candy from her mother's purse and then lied about it.

LaValley testified that, as a licensed marriage and family therapist, she is required by law to report suspected child abuse.  She did not report K.N.'s accusation to police because K.N. recanted, and LaValley did not believe the accusation anyway.  However, LaValley admitted she never asked K.N. what happened and never met with K.N. alone.  Instead, LaValley had petitioner's wife Brenda present, as well as K.N.'s mother.  When K.N. confirmed she had told Brenda that petitioner touched her inappropriately, Brenda told K.N. "soft and gentle" that it was important to tell the truth, no matter what, and she was not in trouble.  LaValley testified she handled it this way because she suspected K.N.'s accusation was a lie.  LaValley testified that if she had asked K.N. what happened, "I think based on the dynamics of [K.N.], what – psychodynamically and her behaviors, which is severe lying, that – phrasing it that way would have opened up for, yes, slam dunk, I can lie about this.  So we took a very different approach but one that would set it up where she could tell the truth.  [¶]  And if there had been anything more, any questions that I had, I would have pursued it.  And I didn't because I had no reasonable suspicion at that time."  LaValley said K.N. was not crying or upset when she recanted.  She said the three adults in the room "all agreed" the recantation was true.  LaValley did not memorialize the meeting in writing.

### c.   The Children's Medications

Psychiatrist Jeremy Colley testified as a defense expert that Risperdal, Geodon, Abilify, and Seroquel were approved for or used off-label to treat schizophrenia, bipolar mania, and disruptive behaviors associated with autism.  These drugs have a high rate of somnolence or sedation.  Somnolence and sedation affects the memory process, because of the resulting inattention to stimuli.  As Dr. Colley explained, "if [ ] perceptions never make it to the part of the brain where the memory is stored then the memory never get [sic] there and you can't go on to

13

1   retrieve it."  Schizophrenia and bipolar mania cause severe disruptions in the ability to perceive

2   reality accurately and communicate with language and behavior.  Topamax, Depakote, and

3   Trileptal treat seizures; Zoloft is an anti-depressant; and Focalin addresses attention-deficit

4   hyperactivity.  All have side effects of sedation and impairment of memory or cognitive

5   functioning.

6                   d.   Petitioner's Testimony

7          Petitioner denied all charges.  He testified he is six feet two inches tall and weighed 410

8   pounds at the time in question (but weighed much less at trial).  He was honorably discharged

9   from the Air Force in 1986 after a four-year stint.  He then sold computers, then sold cars, then

10  injured himself working for a rent-to-own company and was on disability for four years.  He then

11  had several other jobs.  In February 2005, the Danielses started a cleaning business.  Petitioner

12  went to seminary school and became a pastor of his church around October 2005.

13         The Danielses started doing respite care at LaValley's suggestion, after they had success

14  with their own adopted children who had issues.  The foster agency had sent the Danielses for

15  training in dealing with difficult children.  Brenda was the primary caretaker.  Petitioner and

16  Brenda are the only adults in their household; only their teenage daughters would be present when

17  he and his wife are gone.  Petitioner admitted that he has a loud voice and would yell at the

18  children sometimes.

19         Petitioner testified that on July 5, 2005, he came home at lunchtime, saw A.G. asleep on

20  the floor, tried to wake her without success, and had his daughter move A.G. into the daughter's

21  bedroom.  LaValley arrived for a therapy session with a different child.  Petitioner went down the

22  hall to use the restroom.  He opened the bedroom door to let the cat into the bedroom, then shut

23  the door.  He did not enter the bedroom.  He then joined the others for the therapy session.

24  Around 5:00 p.m., A.G.'s mother phoned and said in an urgent, distressed voice, that she wanted

25  to talk to Brenda, but Brenda was not there.  Petitioner phoned his wife and told her.  After

26  awhile, Brenda came home and said she went to A.G.'s home and the police were there.

27         After A.G.'s allegation, petitioner and his wife were "terrified" and decided to stop

28  bringing children into their home.

                                        14

Petitioner denied touching H.N. on her birthday and said she was not even there on her birthday.

Petitioner spanked only his own children.  With the other children, the Danielses used "natural consequences."  For example, to handle a child who lied, the Danielses would ask if the child wanted broccoli or ice cream for dinner.  The child would say "ice cream" but would be given broccoli.  When the child, mouth agape, would ask why the Danielses were doing that, they would say, "'We thought you were playing the lying game.'"  Other consequences were that the child had to do jumping jacks, walk on her knees, or hold the plank position for 10 or 20 seconds.

Petitioner testified that he told all prospective respite care parents about revocation of the daycare license and foster care certification.  He testified he told them the reason was because there was "an allegation that I had threatened someone with a gun," and "an allegation of misappropriation of funds."  Petitioner considered these matters "allegations" despite the administrative law judge's (ALJ) findings that the allegations were true.  He said they would have appealed but did not have the funds or the "heart" to do it.  His attorney showed him the order and that is when he learned he was excluded from employment in a licensed community care facility and that he was precluded from having contact with clients of any licensed community care facility.  He did not say when he was shown the order.

e.   Psychological Evaluation of Petitioner

Psychologist Eugene Roeder testified he conducted a psychological evaluation of petitioner and opined petitioner is well-adjusted, with some obsessive-compulsive personality characteristics, but he did not demonstrate any psychological difficulties, personality disorders, or characteristics that the doctor would expect to find in a child molester.  Research on child molesters show they generally have some history of sexually deviant behavior and some identifiable psychological problems.

f.   Defense Expert Regarding CSAAS

Defense expert Dr. William O'Donohue testified to his opinion that CSAAS is "junk science" with multiple problems and is not generally accepted in the scientific community of mental health professionals.  He gave examples of problems, e.g., CSAAS was not derived from a

15

scientific study but instead from personal experience and anecdotal evidence, and CSAAS says it is common for child molest victims to recant, whereas studies have shown only four to 20 percent recant.  However, Dr. O'Donohue agreed that delayed reporting is common, though he criticized CSAAS for being vague about what constitutes "delay."  Dr. O'Donohue said children are naturally suggestible and can come to believe something happened that did not happen.  Children with mental health issues are even more suggestible.  "Children that either have cognitive problems, that have behavioral problems such as oppositional defiant disorder, conduct disorder, children that have problems processing information like with attention deficit disorder, attention deficit disorder with hyperactivity could have a higher rate of suggestibility.  Individuals who are schizophrenic, children who are schizophrenic, who have poor reality context are the highest."

g.  Other Witnesses

D.M., age twenty at the time of trial, was the boy with whom H.B.1 said she was made to have sex by petitioner.  D.M. sometimes went by the name John.  D.M., who referred to petitioner as his father (although not biological or adopted), denied that this ever happened.  In 2005, he was thirteen years old.  D.M. had lived with the Danielses from age ten to age twenty, with the exception of six months.  He was still living with them at the time of his testimony.[9]

Five defense witnesses, including former clients, testified they knew petitioner, considered him an honest person, disbelieved the allegations against him, and would feel comfortable leaving their children or grandchildren with him.[10]  One witness, a church board member who knew petitioner in his capacity as pastor of the church, was asked on cross-examination if her opinion of him would change if she knew he had threatened a foster agency worker with a gun if the worker came to take back a foster child.  The witness said, "It would depend on the circumstances and why the social worker wanted to take the child away."  Another witness, who had her child in petitioner's daycare years earlier and had borrowed money from petitioner, simply answered, "No," when asked if her opinion would change if she knew petitioner had threatened a state

---

[9]  D.M.'s mother also testified regarding his time at the Danielses.  4 RT 1550-67.

[10]  The record reflects that the defense called nine character witnesses, including a former respite child, two former clients, two friends of petitioner's daughters, and four church members. Petitioner's daughters also testified on his behalf.

16

1    worker with a gun for trying to take back a foster child.

2              3.   Prosecution's Rebuttal Evidence

3         In 2003, the Danielses' daycare license was revoked, and the foster agency dropped them,

4    for reasons—disputed by the Danielses—including misappropriation of funds, relating to the

5    retention of agency overpayments, and child endangerment, relating to petitioner's threat to use a

6    gun to prevent the foster agency from taking back an infant the Danielses wanted to adopt.

7    Petitioner was precluded from future employment at any licensed community care facility or

8    having contact with clients of a licensed community care facility.  The Danielses nevertheless

9    kept giving respite care, and LaValley kept making referrals and getting paid for counseling the

10   "respite care" children in therapy sessions conducted at the Danielses' home in the presence of

11   either petitioner or his wife and a parent of the child.

12        Joseph Kovill, a clinical psychologist and CEO of Positive Option Family Service,

13   testified Positive Option is licensed for community care and certifies families to serve as foster

14   homes.  They certified the Danielses' home for foster care but had nothing to do with the

15   Danielses' other childcare activities.

16        In January 2003, while Kovill was Positive Option's clinical director, he heard rumors

17   "from the community at large" criticizing the agency for running a "boot camp for children."

18   Kovill visited the Danielses' home, which at the time had one foster infant, Paul M., whom the

19   Danielses hoped to adopt.  Kovill was concerned about the quality of care he saw.  Two children

20   on one side of a table were eating Kentucky Fried Chicken, while three children sat on the other

21   side of the table—one eating spaghetti with nothing on it, the second eating green beans only, and

22   he could not recall what the third child was eating.  Petitioner's wife asked who wanted an apple

23   fritter, and the two KFC children clamored for it, while the other three sat silently, without

24   moving, hardly looking up from their plates.  Petitioner's wife was talkative with Kovill until

25   petitioner entered the room, at which point she stopped talking.  Petitioner was an uncomfortably

26   forceful presence.

27        Kovill reported his concerns to the County and Community Care Licensing (CCL) and

28   was told to remove the infant from the Danielses' home.  This happened after the Danielses had

expressed their intent to leave the agency, which happened after Positive Option started

investigating the "boot camp" rumor.  Kovill testified there was also a problem with petitioner not

returning about $3,000 or $4,000 of overpayments received from the County, which petitioner

claimed he did not owe, but Kovill said the money was "not a big issue."

Kovill acknowledged that the social worker who made weekly visits to the Danielses'

home, Karen Pino-Smith, turned in "glorious reports" about the Danielses.  Kovill did not consult

her about the decision to remove the infant, because she had already shown herself to be

untrustworthy and was on probation for violating rules and regulations by placing a foster child in

her own home, which was a conflict of interest, and then paying the Danielses to provide daycare

for that child.

William Darnell was the Positive Option staffer who physically removed the infant Paul

M. from the Danielses' home on January 17, 2003.  Darnell testified he phoned to inform the

Danielses that he was coming to remove the child.  Petitioner immediately became irate, yelling,

"'Over my dead body will that child leave here,'" and accusing the agency of retaliation for

reports petitioner supposedly made against the agency.  Darnell checked with his supervisor, then

he tried phoning again several times.  Each time, petitioner became more and more angry,

threatening to sue the agency and saying he had "'a gun if anybody thinks they're coming here to

take this kid.'"[11]  Petitioner also said the infant was not there and claimed he did not know where

his wife had taken the infant.  Petitioner kept referring to "Joshua."  Darnell asked who Joshua

was because the infant's name was Paul.  Petitioner said they renamed the infant, and his real

name was now Joshua.[12]  After several conversations, Darnell felt petitioner would relinquish the

baby peacefully, and he eventually picked up the infant around 1:00 a.m.

ALJ Ann Sarli testified that in May 2003 she presided over an administrative hearing

initiated by the Community Care Licensing Division (CCL), following which she (1) revoked

---

[11]  On cross-examination, petitioner denied saying he had a gun when the foster agency worker
called to remove the child.  He claimed he just said, "'Over my dead body.'"

[12]  Petitioner had testified on cross-examination by the prosecution that they did not change Paul's
name to Joshua.  He said Joshua was just a nickname, but they had talked about changing the
name if the adoption went through.

1  Brenda Daniels' child care license, (2) revoked Brenda Daniels' family home certification, (3)

2  denied Brenda Daniels' application to operate a foster home, and (4) ordered that "Tommy Gene

3  Daniels is excluded from employment in or contact with clients of a licensed community care

4  facility."

5            4.  Surrebuttal Witness

6        Former Positive Option social worker Karen Pino-Smith testified she made weekly visits

7  to the Danielses' home for about a year and a half to two years, during which she never had any

8  concerns about the way the Danielses were treating the children.  Pino-Smith herself sometimes

9  paid the Danielses to babysit for Pino-Smith's own foster child.

10     C.  Outcome

11        The jury found petitioner not guilty on Count Five (alleging petitioner directed K.N. to

12  touch herself in the shared bathroom) but guilty on all other counts.  The jury also found true the

13  multiple-victim allegation.

14        Petitioner was sentenced to a determinate term of eight years on Count One, followed by a

15  consecutive indeterminate term of 150 years to life (15 years to life for each of the other ten

16  counts).

17  II.     Post-Conviction Proceedings

18        Petitioner timely appealed, and the California Court of Appeal affirmed the judgment of

19  conviction on June 25, 2015.  Lodged Doc. 19.  The California Supreme Court denied review on

20  September 30, 2015.  Lodged Doc. 21.

21        Petitioner filed a petition for writ of habeas corpus in the California Supreme Court, which

22  was denied without comment or citation on February 5, 2017.  Lodged Docs. 22, 23.

23        The instant federal petition was filed December 27, 2016.  ECF No. 1.

24       STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

25        28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of

26  1996 ("AEDPA"), provides in relevant part as follows:

27  ////

28  ////

1

2

3

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

4

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

5

6

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

7

8    The statute applies whenever the state court has denied a federal claim on its merits,

9   whether or not the state court explained its reasons. Harrington v. Richter, 562 U.S. 86, 99

10   (2011). State court rejection of a federal claim will be presumed to have been on the merits

11   absent any indication or state-law procedural principles to the contrary. Id. (citing Harris v. Reed,

12   489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a

13   decision appearing to rest on federal grounds was decided on another basis)). "The presumption

14   may be overcome when there is reason to think some other explanation for the state court's

15   decision is more likely." Id. at 99-100.

16   The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal

17   principle or principles" previously articulated by the Supreme Court. Lockyer v. Andrade, 538

18   U.S. 63, 71-72 (2003). Only Supreme Court precedent may constitute "clearly established

19   Federal law," but courts may look to circuit law "to ascertain whether . . . the particular point in

20   issue is clearly established by Supreme Court precedent." Marshall v. Rodgers, 569 U.S. 58, 64

21   (2013).

22   A state court decision is "contrary to" clearly established federal law if the decision

23   "contradicts the governing law set forth in [the Supreme Court's] cases." Williams v. Taylor, 529

24   U.S. 362, 405 (2000). A state court decision "unreasonably applies" federal law "if the state

25   court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to

26   the facts of the particular state prisoner's case." Id. at 407-08. It is not enough that the state court

27   was incorrect in the view of the federal habeas court; the state court decision must be objectively

28   unreasonable. Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

20

Review under § 2254(d) is limited to the record that was before the state court.  Cullen v. Pinholster, 563 U.S. 170, 180-81 (2011).  The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it.  Id. at 181-82.  In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did."  Id. at 182.  Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis."  Frantz v. Hazey, 533 F.3d 724, 738 (9th Cir. 2008) (en banc).  A different rule applies where the state court rejects claims summarily, without a reasoned opinion.  In Richter, supra, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must determine what arguments or theories may have supported the state court's decision, and subject those arguments or theories to § 2254(d) scrutiny.  Richter, 563 U.S. at 102.

DISCUSSION

I.      Claim One: Expert Testimony Regarding CSAAS Violated Due Process

A.  Petitioner's Allegations and Pertinent State Court Record

Petitioner contends that his right to due process was violated by the admission of Dr. Urquiza's expert testimony regarding CSAAS.  ECF No. 1 at 41-57.  He argues that the evidence (1) lacked probative value; (2) usurped the jury's role of determining credibility; (3) could be easily misconstrued as corroboration of a victim's claims; (4) is not universally accepted; (5) is not well supported by empirical research except as to delayed disclosures, for which there is little misconception; and (6) was prejudicial.  Id.  Petitioner also argues that the erroneous admission of CSAAS evidence was compounded when the court (1) prohibited petitioner's expert from testifying that CSAAS testimony is excluded in other states and (2) instructed the jury that CSAAS evidence could be used in evaluating the believability of a victim's testimony.  Id. at 50-51.

Before trial, defense counsel moved to exclude evidence regarding CSAAS on the grounds that there were no misconceptions to dispel, CSAAS evidence does not have empirical support, the study used to develop CSAAS did not include children with significant mental health

1  issues, and CSAAS evidence was unduly prejudicial.  1 CT 134-44, 243-48; 1 RT 122-26.[13]  The

2  court ruled that CSAAS evidence was "admissible only to dispel common misconceptions that the

3  jurors may hold as to how victims react to abuse.  And with respect to the admissibility, the

4  People must identify the misconception that the evidence is designed to correct and the testimony

5  must be limited to explaining why the victim's behavior is not inconsistent with abuse."  1 RT

6  129.

7      After the victims testified and prior to Dr. Urquiza's testimony, petitioner renewed his

8  objections to Dr. Urquiza being called to testify regarding CSAAS and argued that the

9  prosecution had not meet the admissibility requirements.  3 RT 1052-53, 1055-57.  The court

10  found that the requirements for admissibility had been established and overruled the objections.

11  3 RT 1060.  Dr. Urquiza testified about CSAAS and explained its five parts: (1) secrecy; (2)

12  helplessness; (3) entrapment and accommodation; (4) delayed and unconvincing disclosure; and

13  (5) retraction of an allegation of abuse.  3 RT 1090-1125.  He also testified that he had not read

14  any police reports related to petitioner's case, that he had never met or interviewed any of the

15  victims, and that it is inappropriate to use CSAAS to determine whether a child had been sexually

16  abused.  3 RT 1105-06.

17      Prior to the testimony of petitioner's expert, Dr. O'Donohue, the prosecution requested

18  that he not be allowed to give testimony regarding the admissibility of CSAAS evidence in other

19  states and the objection was sustained.  4 RT 1595-97.  Before Dr. O'Donohue took the stand, the

20  jury was instructed with CALCRIM No. 1193, as follows:

21      Ladies and gentlemen, you have heard testimony from Dr. Urquiza
22      and you are about to hear testimony from Dr. O'Donohue regarding
       the Child Sexual Abuse Accommodation Syndrome.

23      This testimony about Child Sexual Abuse Accommodation
24      Syndrome is not evidence that the defendant committed any of the
       crimes charged against him.  You may consider this evidence only in
25      deciding whether or not a victim's conduct was not inconsistent with
       the conduct of someone who has been molested and in evaluating the
26      believability of a victim's testimony.

27

28  [13] "RT" refers to the Reporter's Transcript on Appeal, Volumes 1-5 (Lodged Docs. 8-12).  The
    state court record also includes three volumes of Augmented RT (Lodged Docs. 13-15).

1  4 RT 1605-06.  Dr. O'Donohue then testified that CSAAS has "21 major problems," is "junk

2  science," is not generally accepted in the scientific community of mental health professionals, and

3  does not account for false allegations.  4 RT 1610-28, 1647-65.  He also testified that contrary to

4  what CSAAS says, recantation and inconsistent allegations are not common.  4 RT 1612.

5       Before deliberations, the jury was instructed with CALJIC No. 10.64 as follows:

6         Witnesses have given testimony relating to the Child Sexual Abuse
          Accommodation Syndrome.  This evidence is not received and must

7         not be considered by you as proof that any alleged victim's
          molestation claim is true.

8
          Child Sexual Abuse Accommodation Syndrome research is based
9         upon an approach that is completely different from that which you
          must take to this case.  The syndrome research begins with the
10        assumption that a molestation has occurred and seeks to describe and
          explain common reactions of children to that experience.
11
          As distinguished from that research approach, you are to presume the
12        defendant innocent.  The People have the burden of proving guilt
          beyond a reasonable doubt.
13
          Thus, you may consider the evidence concerning the syndrome and
14        its effect only for the limited purpose of showing, if it does, that an
          alleged victim's reactions, as demonstrated by the evidence, are not
15        inconsistent with her having been molested.

16 5 RT 1858; 3 CT 753.

17       B.  <u>The Clearly Established Federal Law</u>

18         1.  <u>Admission of CSAAS Evidence</u>

19       The admission of evidence is governed by state law, and habeas relief does not lie for

20  errors of state law.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 67 (1991).  The erroneous admission of

21  evidence violates due process, and thus supports federal habeas relief, only when it results in the

22  denial of a fundamentally fair trial.  <u>Id.</u> at 72.  The Supreme Court has rejected the argument that

23  due process necessarily requires the exclusion of prejudicial or unreliable evidence.  <u>See</u> <u>Spencer</u>

24  <u>v. Texas</u>, 385 U.S. 554, 563-64 (1967) (state procedure for enforcing recidivist statutes that

25  included presenting evidence of past convictions and instructing jury that they did not bear on

26  defendant's guilt or innocence did not violate due process even if there was "possibility of some

27  collateral prejudice"); <u>Perry v. New Hampshire</u>, 565 U.S. 228, 245 (2012) ("[T]he potential

28  unreliability of a type of evidence does not alone render its introduction at the defendant's trial

1   fundamentally unfair." (citations omitted)).

2                    2.   Exclusion of Expert Testimony

3         "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a

4   complete defense.'"  Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quoting California v.

5   Trombetta, 467 U.S. 479, 485 (1984)).  However, "[w]hile the Constitution thus prohibits the

6   exclusion of defense evidence under rules that serve no legitimate purpose or that are

7   disproportionate to the ends that they are asserted to promote, well-established rules of evidence

8   permit trial judges to exclude evidence if its probative value is outweighed by certain other

9   factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury."  Holmes

10  v. South Carolina, 547 U.S. 319, 326 (2006) (citations omitted).

11                   3.   Jury Instruction

12        Erroneous jury instructions do not support federal habeas relief unless the infirm

13  instruction "so infected the entire trial that the resulting conviction violates due process."  Estelle,

14  502 U.S. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)); see also Donnelly v.

15  DeChristoforo, 416 U.S. 637, 643 (1974) ("[I]t must be established not merely that the instruction

16  is undesirable, erroneous, or even 'universally condemned,' but that it violated some

17  [constitutional right]" (alteration in original) (citation omitted)).  The challenged instruction

18  "'may not be judged in artificial isolation,' but must be considered in the context of the

19  instructions as a whole and the trial record."  Estelle, 502 U.S. at 72 (quoting Naughten, 414 U.S.

20  at 147).  Moreover, relief is only available if there is a reasonable likelihood that the jury has

21  applied the challenged instruction in a way that violates the constitution.  Id. at 72-73.

22                   C.   The State Court's Ruling

23        This claim was raised on direct appeal.  Because the California Supreme Court denied

24  discretionary review, the opinion of the California Court of Appeal constitutes the last reasoned

25  decision on the merits and is the subject of habeas review in this court.  See Ylst v. Nunnemaker,

26  501 U.S. 797 (1991); Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012).

27  ////

28  ////

                                        24

The state appellate court ruled in pertinent part as follows:

> Defendant argues admission of CSAAS evidence was so irrelevant and prejudicial that it violated his right to a fair trial and due process of law.  We disagree.
>
> A.  Background
>
> Defendant moved in limine to exclude all CSAAS evidence on the grounds that it was controversial and not designed to determine the truth of the allegations and could mislead the jury; that no misconceptions remain in 2011 about child sex abuse victims' behavior; that CSAAS has too little empirical support; and that CSAAS was irrelevant because the study developing it as a diagnostic tool did not include children with psychiatric and mental health histories, and four of the five victims in this case had significant mental health problems.  The defense further argued that, if the court allowed CSAAS evidence, it should do so for the limited purpose of disabusing jurors of specific, identified misconceptions about how a child reacts to molestation.  The defense alternatively sought exclusion under Evidence Code section 352 of all CSAAS evidence as more prejudicial than probative, except for a stipulated statement to the jury that "[i]f Dr. Urquiza was to testify, he would indicate that delayed disclosure of sexual abuse is not inconsistent with children who have been molested."
>
> The prosecution opposed the motion, arguing the expert's testimony was relevant to explain the seemingly paradoxical behavior of the victims with respect to all five CSAAS categories—secrecy, helplessness, entrapment/accommodation, delayed or unconvincing disclosure, and retraction.  The prosecutor asserted defendant was a resident molester in a position of power and authority over the victims; at least four victims were subjected to an alarm system that essentially tethered them to their beds; defendant threatened one of the victims and used physical force as punishment on more than one victim; and four victims delayed disclosure.  The prosecutor cited case law that identifying the myth or misconception to be addressed by the proffered CSAAS evidence does not mean the prosecutor must expressly state on the record the evidence which is inconsistent with molestation.  Rather, it suffices if the victim's credibility is in issue due to the paradoxical behavior, including delayed reporting.
>
> At a hearing on the motion, the trial court said there were two requirements for admissibility—(1) the prosecutor must identify the misconception that the evidence is designed to correct, and (2) the testimony must be limited to explaining why the victim's behavior is not inconsistent with abuse.  The prosecutor stated she wanted to present the expert's testimony after the victims testified, as she expected the defense to challenge the victims' credibility on cross-examination.  Her initial expectation was to use all of the CSAAS categories except retraction.
>
> The defense argued CSAAS does not account for children with psychiatric and/or mental illness issues.  Dr. Roland Summit, who wrote the seminal article on CSAAS, has repeatedly stated in his

subsequent writings that CSAAS involves "normal" children. This case involves children with significant mental health issues. Defense counsel argued the only potential relevance of CSAAS evidence in this case was on the issue of delayed disclosure, and the defense was willing to stipulate that abused children sometimes delay in disclosing the abuse.

The prosecutor was not interested in the proposed stipulation. And she noted she would be making a motion to exclude mental health evidence at trial.

The trial court ruled CSAAS evidence would be admissible in the prosecution's case-in-chief if the misconception it was designed to correct was identified, and the CSAAS evidence had to be limited to explaining why a child's behavior is not inconsistent with abuse. The court said the prosecutor had identified four of the five CSAAS categories (all except "retraction") as the target misconceptions.

Later, as the court and counsel discussed whether the court should allow evidence of the victims' psychiatric diagnoses, the court asked the prosecutor about defendant's desire to question applicability of CSAAS to children with mental health issues. The prosecutor said she did not know what Dr. Urquiza would say but expected defense counsel could call and ask him. The trial court tentatively expressed its view that psychiatric diagnoses were inadmissible.

After the victims testified at trial and before Dr. Urquiza testified, defendant renewed his objection to the CSAAS evidence. He invoked his previous arguments and added a new one—that voir dire did not reveal any juror misconceptions necessitating the evidence, and some prospective jurors stated in the questionnaire that they themselves were child victims who had delayed disclosure. The prosecutor objected to reliance on voir dire, expressed doubt that any past victims had been seated on the jury, and identified the misconceptions as relating to delayed disclosure and unconvincing disclosure that changes over time. The prosecutor then stated four CSAAS categories were relevant here, and possibly the fifth (retraction) would become relevant after LaValley testified about K.N. retracting her accusation. When the court noted defense counsel had already disclosed the retraction in his opening statement, the prosecutor said she was identifying all five CSAAS categories as relevant. "The secrecy prong that talks about things that the perpetrator will do to help insure that a secret is kept including threats, and we had at least one child talk about don't tell or I'll find you. I know where you live. [¶] Regarding the next prong, helplessness, in situations where the individual [is] responsible for protecting the child. So when they are there, and the defendant and his wife are the caregivers, and that's the very person perpetrating the crime that there is a sense of helplessness. [¶] The entrapment or accommodation. We had one child talk about how she would shut down when the conduct would happen, one or more other victims talking about pretending to be asleep. And that applies to that prong. The delayed and unconvincing disclosure that we have already talked about and that we have seen with four witnesses. [¶] And I would dispute what the defense says. I think some of the questions have

26

insinuated that you talked to Mell La[V]alley. She was there to help you. You didn't tell her. You had these opportunities to, you know, be at home with your [mother and father], go to church with them. So I think that through the question that that insinuation is there. [¶] . . . [¶] And finally the retraction, it would be really in anticipation of what Mell La[V]alley or perhaps Brenda or the defendant himself will say that [K.N.] took it back."

The trial court overruled the defense objection to the CSAAS evidence, finding the requirements for admissibility had been satisfied.

On November 21, 2011, four days after Dr. Urquiza testified, the defense filed a written motion in which it asserted surprise at the doctor's testimony about a Canadian study that few child sex abuse allegations are false,[n.12] and defendant asked the trial court to "instruct the jury as soon as possible" on the limited use of CSAAS evidence.[n.13] The defense argued in a footnote, that the instruction was "of particular importance now that the prosecution's CSAAS expert suggested to the jury that kids don't make false allegations of sexual abuse." Argument on the motion was held at the conclusion of the trial proceedings on November 22, 2011.[n.14] During argument, counsel for the defense requested that the instruction be given before his expert testified, since his expert would be addressing CSAAS directly. In response to the prosecution's question about the specific instruction the trial court might give, the court said, "We do have a CALCRIM. And then in the Patino [n.15] case we have what the Court specifically instructed in that case, which was affirmed." The prosecutor indicated she preferred that the court give the CALCRIM instruction. The defense offered nothing in reply to the court's statement about the instruction it would give.

n.12 This testimony was given on redirect examination after defense counsel had concluded his cross-examination of Dr. Urquiza by establishing that children do make false allegations about sexual abuse.

n.13 The defense requested that the jury be instructed as follows: "(a) The jury may consider the [CSAAS] testimony only for the limited purpose of showing, if it did, that the alleged victim's reactions as demonstrated by the evidence were not inconsistent with her having been molested; [¶] (b) The prosecution still has the burden of proving guilt beyond a reasonable doubt; [¶] (c) [CSAAS] research was based upon an approach that is completely different from that which the jury must take in the [sic] criminal matter; [¶] (d) Research pertaining to the [CSAAS] begins with the assumption that a molestation has occurred and seeks to explain common reactions of children to that experience. In contrast, in this matter the jury must presume that the defendant is innocent; [¶] (e) [CSAAS] testimony is not received and must not be considered by the jury as proof that the alleged victim's molestation claim (or claims) is true."

n.14 On November 22, several defense witnesses testified,

27

including Brenda, LaValley, and defendant.  The court released the jury for the Thanksgiving Holiday until the following Monday, November 28, 2011, and then held a hearing on the motion.

> n.15  People v. Patino (1994) 26 Cal. App. 4th 1737, 1747 (Patino).

On the Monday after the Thanksgiving holiday break, just before defense CSAAS expert Dr. O'Donohue took the stand, the trial court instructed the jury using CALCRIM No. 1193 modified slightly to reference the testimony of both experts:

"[Y]ou have heard testimony from Dr. Urquiza *and you are about to hear testimony from Dr. O'Donohue*[n.16] regarding the [CSAAS]. [¶]  This testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him.  You may consider this evidence only in deciding whether or not a victim's conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of a victim's testimony."

> n.16    The  italicized  language  modified  the  standard CALCRIM No. 1193.

Before deliberations, the trial court instructed the jury consistent with CALJIC No. 10.64[n.17] that CSAAS evidence "is not received and must not be considered by you as proof that any alleged victim's molestation claim is true.  [¶]  [CSAAS] research is based upon an approach that is completely different from that which you must take to this case.  The syndrome research begins with the assumption that a molestation has occurred and seeks to describe and explain common  reactions  of  children  to  that  experience.    [¶]    As distinguished from that research approach, you are to presume the defendant innocent.  The People have the burden of proving guilt beyond a reasonable doubt.  [¶]  Thus, you may consider the evidence concerning the syndrome and its effect only for the limited purpose of showing, if it does, that an alleged victim's reactions, as demonstrated by the evidence, are not inconsistent with her having been molested."

> n.17  The instruction has its origin in Patino, supra, 26 Cal. App. 4th at page 1746, footnote 2.

B.  Analysis

On appeal, defendant argues the CSAAS evidence was so irrelevant and prejudicial that it violated his constitutional right to a fair trial and due process of law.[n.18]  (U.S. Const., 5th, 6th, 14th Amends.; Cal. Const., art. I, §§ 1, 7, 15, 16.)  He argues the trial court should have excluded CSAAS evidence because it (1) lacks probative value, (2) usurps the jury's role in determining credibility, (3) may be misconstrued as corroboration of the victims' claims, and (4) lacks empirical  support  and  scientific  or  professional  acceptance. Defendant then adds contentions that the trial court erred by (5) failing  to  require  the  prosecution  to  identify  the  misconceptions

being targeted, (6) telling the jury that CSAAS evidence could be used "'in evaluating the believability of a victim's testimony,'" and (7) prohibiting the defense expert from testifying about the exclusion of CSAAS testimony in sister states.  Finally, defendant argues (8) he was prejudiced by the assertedly improper introduction of CSAAS evidence.  We reject the contentions.

> n.18  Defendant's request in the trial court to "'federalize'" all relevance objections to deem them to incorporate a due process challenge and his constitutional claims on appeal appear to do no more than add a "constitutional 'gloss'" to his argument in the trial court seeking to exclude or limit the evidence under Evidence Code section 352.  (People v. Rundle (2008) 43 Cal. 4th 76, 109, fn.6, overruled in part on other grounds in People v. Doolin (2009) 45 Cal. 4th 390, 421.)  In such a case, rejection on the merits of the challenge to the trial court's ruling necessarily leads to rejection of the constitutional claim, and no separate constitutional discussion is required.  (Rundle, at p.109, fn.6.)

1.  Standard of Review

Defendant acknowledges that the trial court's ruling on admissibility of expert testimony is reviewed for abuse of discretion.  (People v. Lindberg (2008) 45 Cal. 4th 1, 45; see also People v. Bradley (2012) 208 Cal. App. 4th 64, 84.)

Even assuming defendant preserved a due process challenge in the trial court, the essence of a due process violation is denial of a criminal defendant's right to a fair trial, and on appeal, the defendant must demonstrate how his fundamental right to a fair trial was violated by introduction of the CSAAS evidence.  (Patino, supra, 26 Cal. App. 4th at p.1747 [rejected due process challenge to CSAAS evidence, because the defendant failed to demonstrate how his constitutional right to a fair trial was violated by the introduction of CSAAS testimony to rehabilitate the victim's testimony after a rigorous defense cross-examination calling into question the victim's credibility].)

2.  Probative Value

Though CSAAS evidence is inadmissible to prove a defendant sexually abused a child, it is admissible to disabuse jurors of misconceptions they might hold about how a child reacts to a molestation, and to explain emotional antecedents of abused childrens' seemingly self-impeaching behavior.  (People v. Perez (2010) 182 Cal. App. 4th 231, 245.)  CSAAS evidence is admissible to rehabilitate credibility when the defense suggests a child's conduct after the incident is inconsistent with abuse.  (People v. Sandoval (2008) 164 Cal. App. 4th 994, 1001 (Sandoval).)  CSAAS evidence simply tells the jury that certain behavior by a child does not necessarily *disprove* an allegation of sexual abuse.

CSAAS evidence must be tailored to address the specific myth or misconception suggested by the evidence.  (People v. Wells (2004)

29

118 Cal. App. 4th 179, 188.)   The prosecution has the burden to identify the myth or misconception, but that burden is satisfied where the child's credibility is placed in issue due to paradoxical behavior. (Patino, supra, 26 Cal. App. 4th at pp.1744-1745.)

Though the foregoing cases and many other Court of Appeal cases uphold admissibility of CSAAS evidence, defendant considers it an open question because the California Supreme Court has never directly held CSAAS evidence admissible, though it has upheld evidence regarding parental reluctance to report child molestation (People v. McAlpin (1991) 53 Cal. 3d 1289, 1300 (McAlpin)); rape trauma syndrome (People v. Bledsoe (1984) 36 Cal. 3d 236, 247-248); and the behavior of domestic violence victims (People v. Brown (2004) 33 Cal. 4th 892, 905-908 (Brown)).

However, our high court in McAlpin held that the evidence at issue in that case was admissible by analogy to the reasoning of Court of Appeal cases holding CSAAS evidence admissible.   (McAlpin, supra, 53 Cal. 3d at p.1300.)   And the court in Brown similarly analogized to its earlier analysis in McAlpin.   (Brown, supra, 33 Cal. 4th at pp.905-906.)

Here, myths and misconceptions addressed by all components of CSAAS were suggested by the evidence, and Dr. Urquiza's testimony was highly relevant to support the victims' credibility and rebut those misconceptions about how a child victim reacts to sexual abuse.   Defense counsel asserted in his opening statement that four of the victims are liars, and that K.N. admitted she lied by recanting her accusation that defendant touched her inappropriately.   Defense counsel also told the jury the evidence would show that H.B.1 claimed defendant forced her, K.N., and H.N., to have sex with defendant's son, John, but K.N. and H.N. denied it.   Counsel also pointed out that H.B.2 said she and H.B.1 were molested together, but H.B.1 said she was always alone when defendant molested her. Defense counsel hammered on these points in cross-examination of the victims.

The CSAAS evidence was relevant to rebut misconceptions the defense hoped to exploit, e.g., that K.N.'s recantation meant her accusation was a lie; that real victims would have total recall and not have inconsistencies in their statements; that real victims would have reported abuse sooner rather than wait and pile on when they heard other children were reporting abuse.   CSAAS was helpful in explaining that delayed reporting does not necessarily disprove the accusation, because of the helplessness in the manipulative or threatening environment often created by an abuser who occupies a position of power over the children, particularly here where it was the children's own parents who placed the children in that environment.

Defendant argues CSAAS evidence lacks probative value because its aspects are just as consistent with false testimony as with true testimony.   That the "particular aspects of CSAAS are as consistent with false testimony as true testimony" was noted by the court in Patino.   (Patino, supra, 26 Cal. App. 4th at p.1744.)   Nevertheless,

the Patino court recognized that CSAAS testimony has been held admissible for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts and concluded the CSAAS testimony in that case was pertinent because an issue had been raised by the defense as the victim's credibility. (Id. at pp.1744-1745.)

Defendant argues CSAAS has no tendency to prove a material fact but instead is "'self-nullifying'" in that it tells the jury that, no matter how the child behaved, that behavior is consistent with abuse. Defendant cites an Iowa case which said CSAAS evidence is problematic because "in some instances it seeks to show why the behavior of an alleged abused child is the same as, not different from, the behavior of a child who has never been abused.  The testimony may seek to explain why the child acted normally.  [Citation.]  The fact a child acted normally is not evidence of abuse."  (State v. Stribley (Iowa Ct. App. 1995) 532 N.W.2d 170, 174.)  The Iowa court opinion does not bind us (People v. Mays (2009) 174 Cal. App. 4th 156, 167 (Mays)), and the quotation reveals the Iowa court's (and defendant's) misperception of the proper use of CSAAS in court, which is simply to tell the jury that certain behavior is not necessarily inconsistent with an abuse allegation.  Moreover, contrary to defendant's claim, the Iowa court did not exclude use of CSAAS evidence.  There, a doctor testified for the prosecution that photographs supported a conclusion that there had been vaginal penetration and trauma to the hymen.  (Stribley, at pp.171-172.)  A doctor testifying for the defense opined that no such conclusion could be drawn from the photographs.  (Id. at p.172.)  On cross-examination of the defense expert, the prosecutor elicited—without objection—testimony about CSAAS.  (Id. at p.173.)  On appeal, the defendant claimed ineffective assistance of counsel in trial counsel's failure to object.  (Id. at p.173.)  The Iowa court said some (unspecified) portions of the CSAAS evidence would have been excluded had defense counsel objected, but the defendant failed to show prejudice, and so the appellate court affirmed the judgment.  (Id. at p.174.)

Defendant acknowledges that the United States Supreme Court rejected a due process challenge to battered child syndrome (Estelle v. McGuire (1991) 502 U.S. 62, 68-70 [116 L. Ed. 2d 385]), and California courts consider battered child syndrome analogous to CSAAS evidence (Patino, supra, 26 Cal. App. 4th at p.1747; People v. Bowker (1988) 203 Cal. App. 3d 385, 393-394 (Bowker)).  Defendant disagrees with the analogy, arguing battered child syndrome is different in that it is a diagnostic tool indicating that serious, repetitive injuries to children are intentional, not accidental, and does not identify a perpetrator.  In contrast, CSAAS describes characteristics shared by children who were not sexually abused and singles out a particular perpetrator because the components of secrecy, entrapment, etc., can relate only to the abuser identified by the child.  However, any distinctions between the two syndromes do not defeat the fairness of allowing CSAAS evidence in this case.

Here, introduction of the CSAAS evidence did not deprive defendant of a fair trial.  In addition to cross-examining the victims, defense

counsel also cross-examined the prosecution's expert at length, presented the defense's own expert, and vigorously argued the evidence suggested the victims' testimony was untrustworthy. There was no due process violation.

We reject defendant's contention that the CSAAS evidence lacks probative value and his contention that its admission violated his due process rights.

### 3.  Claim of Usurpation of Jury's Role

Citing only a Pennsylvania case, Commonwealth v. Dunkle (1992) 529 Pa. 168 [602 A.2d 830], defendant argues CSAAS in effect usurps the jury's role to determine witness credibility, even though it is not supposed to do so. Case law from sister states is not binding on us, though we may consider it. (Mays, supra, 174 Cal. App. 4th at p.167.) The Dunkle court's concern with CSAAS evidence was that it should not be used to prove the child had in fact been sexually abused, and that it was not necessary on the issue of delayed or incomplete disclosure, which the Dunkle court viewed as within the grasp of lay people. (Dunkle, at pp.175, 177, 181-182 [id. at pp.833-834, 836].)

In this case, the CSAAS evidence was not used to prove sexual abuse had occurred. In fact, Dr. Urquiza himself told the jury such use of CSAAS would be inappropriate. He further testified that he had not interviewed the children in this case, never met them, and never read any police reports associated with this case. Moreover, to prevent improper use of CSAAS testimony, the trial court instructed the jury that the CSAAS evidence "is not received and must not be considered by you as proof that any alleged victim's molestation claim is true. [¶] [CSAAS] research is based upon an approach that is completely different from that which you must take to this case. The syndrome research begins with the assumption that a molestation has occurred and seeks to describe and explain common reactions of children to that experience. [¶] As distinguished from that research approach, you are to presume the defendant innocent. The People have the burden of proving guilt beyond a reasonable doubt. [¶] Thus, you may consider the evidence concerning the syndrome and its effect only for the limited purpose of showing, if it does, that an alleged victim's reactions, as demonstrated by the evidence, are not inconsistent with her having been molested."

A similar claim of usurpation of the jury's role was made in a recent habeas corpus case in the federal district court in the Eastern District of California, Gucciardo v. Knipp (E.D. Cal. Jan. 28, 2015, No. 2:13-cv-00323 AC) 2015 WL 403852. At issue in that case was the admissibility of CSAAS testimony given by Dr. Urquiza. The court rejected defendant's claim that the doctor's testimony (which was similar to his testimony here) invaded the jury's province. (Id. at pp.*13-*14.) The court specifically noted that Dr. Urquiza "was not familiar with the victim, had not read the documents related to the case, and was not offering an opinion as to whether she had been molested." (Id. at p.*13.) Rather, as here, "[t]he heart of Urquiza's testimony was a generalized account of the syndrome and its impact

on an abused child." (<u>Ibid.</u>) "Such expert opinion did not invade the jury's province, denying defendant a fair trial." (<u>Id.</u> at p.*14.)  Our view of the evidence in this case is the same.

The CSAAS evidence in this case did not usurp the jury's role.

### 4. Claim that CSAAS Evidence Corroborates Victims

Defendant argues CSAAS evidence can easily be misconstrued as corroboration of a victim's claims, because an opinion on whether the victim's behavior was typical of a molestation victim is closely related to the ultimate question of whether this victim was abused by this abuser. (<u>People v. Housley</u> (1992) 6 Cal. App. 4th 947, 958 (<u>Housley</u>).)

The court in <u>Housley</u> noted that expert testimony about CSAAS could be misconstrued by the jury as corroboration for the victim's claims and might unfairly tip the balance against defendant where the case boiled down to the victim's word against the defendant's word. (<u>Housley</u>, <u>supra</u>, 6 Cal. App. 4th at p.958.)  However, the <u>Housley</u> court said a simple instruction, as used in a prior case, "would clearly define the proper use of such evidence and would prevent the jury from accepting the expert testimony as proof of the molestation." (<u>Ibid.</u>, citing <u>Bowker</u>, <u>supra</u>, 203 Cal. App. 3d 385.)  The court in <u>Housley</u> concluded the trial court had a duty sua sponte to instruct that (1) CSAAS "evidence is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested," and (2) "the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (<u>Housley</u>, at p.959.)

Here, as indicated, the jury received that instruction.

### 5. Empirical/Professional/Scientific Support

Defendant argues CSAAS is "junk science" that is not universally "condoned."  However, when discussing the admissibility of battered womens syndrome testimony, our high court in <u>Brown</u> said admissibility does not depend on a showing based on a "recognized 'syndrome.'" (<u>Brown</u>, <u>supra</u>, 33 Cal. 4th at pp.905-906.)

Defendant cites <u>Lantrip v. Commonwealth</u> (Ky. 1986) 713 S.W.2d 816, but there the Kentucky court rejected use of CSAAS to prove that sexual abuse actually occurred—a use not at issue in this case. (<u>Id.</u> at p.817.)  Defendant asserts some states reject CSAAS evidence, though he acknowledges that other states allow it.  We adhere to the view expressed by California courts and reject the view expressed in the sister state cases upon which defendant relies.

### 6. Delayed Disclosure

Defendant considers CSAAS evidence unnecessary on the issue of delayed disclosure, because according to him, everyone knows delayed disclosure is common in child sex abuse.  He submitted to the trial court a law review article stating that a sampling of the

general public and of jurors suggested that laypeople tend to believe delayed disclosure is common.  However, Dr. Urquiza testified—on cross-examination by the defense—that other research suggests the general public is not well-informed, and Dr. Urquiza's own experience is that parents do not understand why their children did not tell them about sexual abuse.  Defendant fails to show sufficient common knowledge to nullify the probative value of CSAAS on the issue of delayed reporting.

### 7.   Identification of Misconceptions

Defendant complains the trial court failed to require the prosecution to identify the misconceptions it was targeting, in order to determine whether each misconception was beyond common experience such that expert opinion would assist the trier of fact.  Defendant notes CSAAS has been around a long time, since the early 1980's, and his cited law review article indicated most people now understand delayed disclosure.  We have already rejected defendant's argument that the general public does not need expert testimony on the issue of delayed disclosure.  We reject his claim as to other misconceptions as well.

### 8.   Preclusion of CSAAS Evidence in Other States

Defendant argues the trial court intensified the purportedly erroneous admission of CSAAS evidence by prohibiting the defense expert from testifying that sister states' judicial systems exclude CSAAS testimony.  According to defendant, exclusion of testimony that other states have rejected CSAAS gave the jury a false sense of CSAAS's reliability.  However, even assuming defendant's expert psychologist was qualified to render legal opinions (which he was not), any such testimony lacks probative value and presented a substantial danger of misleading the jury as to California law and thus was properly precluded under Evidence Code section 352.

### 9.   Jury Instruction on CSAAS

Defendant complains the trial court "exacerbated its error in admitting the CSAAS evidence" by instructing the jury, right before the defense CSAAS expert testified, "You may consider this evidence only in deciding whether or not a victim's conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of a victim's testimony."  Defendant says the instruction affected his substantial rights, thereby allowing him to raise it on appeal despite his failure to object in the trial court. (§ 1259; People v. Brown (2003) 31 Cal. 4th 518, 539, fn.7.)

However, defendant did not merely fail to object; the defense itself requested that a similar instruction be given.[n.19]  And from the record, it appears that defense counsel acquiesced in the specific instruction the court gave—CALCRIM No. 1193.  In any event, we note that counsel's own proffered instruction also contained the language about which he now complains about on appeal.  As for the timing, the defense made the request for the instruction just before the Thanksgiving Holiday recess.   Defense counsel expressly

34

requested that the instruction be given just before his expert testified on the following Monday. Counsel made this request because his expert would be addressing CSAAS "specifically." Any error is invited, and defendant cannot raise it on appeal. (People v. Wader (1993) 5 Cal. 4th 610, 657-658.)[n.20]

n.19  See fn.14,[14] ante. Defendant's instruction provided that CSAAS evidence could only be used for the limited purpose of "deciding whether or not a victim's conduct was not inconsistent with the conduct of someone who has been molested," but it did not say that the evidence could be used for evaluating the believability of the victim's testimony. But this additional language is actually somewhat redundant. The reason the evidence is admitted to show that the victim's conduct is not inconsistent with having been molested is because inconsistent conduct might otherwise be viewed as an indication that the victim's testimony about having been molested lacks credibility. (See Sandoval, supra, 164 Cal. App. 4th at pp.1001-1002 ["CSAAS testimony 'is admissible to rehabilitate [the molestation victim's] credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation.'"].)

n.20  Insofar as defendant otherwise seeks to challenge the jury instructions, he has forfeited the challenge by failing to present it under a separate heading in his brief and failing to cite any legal authority. (People v. Stanley (1995) 10 Cal. 4th 764, 793; People v. Baniqued (2000) 85 Cal. App. 4th 13, 29; Cal. Rules of Court, rule 8.204(a)(1)(B).)

10. Claim of Prejudice

Defendant argues he was prejudiced by the erroneous admission of CSAAS evidence. As we have said, there was no error.

We conclude defendant fails to show grounds for reversal based on introduction of CSAAS evidence.

Lodged Doc. 19 at 22-37 (alterations in original).

D. Objective Reasonableness Under § 2254(d)

1. Admission of CSAAS Evidence

The Court of Appeal's resolution of the evidentiary issue was based on California law, and accordinmgly may not be revisited here. See Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (explaining that federal habeas corpus relief does not lie for errors of state law); Bradshaw v.

---

[14]  This appears to be a typographical error as petitioner's proposed jury instruction was at footnote 13.

1   Richey, 546 U.S. 74, 76 (2005) (explaining that a federal habeas court is bound by a state court's

2   interpretation of state law).  The only question cognizable in this court is whether admission of

3   the CSAAS testimony rendered the trial fundamentally unfair.  Estelle, 502 U.S. at 72.

4          The state court did not expressly address that question.  Finding no error, the Court of

5   Appeals had no need to discuss the due process dimension of the challenges to the CSAAS expert

6   testimony.  However, even if expert testimony about CSAAS was improper, and even if that

7   impropriety had federal constitutional implications, federal habeas relief is unavailable under the

8   AEDPA.  The United States Supreme Court has never held that due process is violated by the

9   admission of expert testimony about CSAAS.  Indeed, the United States Supreme Court has never

10  held that due process is offended in any context by prejudicial, even inflammatory, expert

11  testimony or any other kind of evidence.  See Holley v. Yarborough, 568 F.3d 1091, 1101 (9th

12  Cir. 2009) (recognizing that the Supreme Court "has not yet made a clear ruling that admission of

13  irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant

14  issuance of the writ").  Absent a holding of the Supreme Court that governs the question,

15  petitioner cannot qualify for the narrow exception to the AEDPA's bar to relief.  Wright v. Van

16  Patten, 552 U.S. 120, 125-26 (2008) (per curiam); see also Holley, 568 F.3d at 1101 ("Under

17  AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair

18  may not permit the grant of federal habeas corpus relief if not forbidden by "clearly established

19  Federal law,' as laid out by the Supreme Court." (quoting 28 U.S.C. § 2254(d))).

20         Moreover, the California Court of Appeal did not unreasonably apply general due process

21  principles in rejecting this claim, and the Ninth Circuit has held that relief is not available under

22  the AEDPA for a claim that admission of CSAAS evidence violates due process.  Brodit v.

23  Cambra, 350 F.3d 985, 991 (9th Cir. 2003).  As in Brodit, the jury in this case was instructed that

24  the expert testimony was to be considered only for the limited purpose of assessing the

25  complaining witnesses' credibility, and not as evidence that petitioner committed any of the

26  crimes charged against him.  See 4 RT 1605-06; 5 RT 1858; 3 CT 753.  Juries are presumed to

27  follow their instructions.  Weeks v. Angelone, 528 U.S. 225, 234 (2000).  Accordingly, in the

28  context of petitioner's trial as a whole, the disputed testimony did not so infect the proceedings as

1    to render them fundamentally unfair.  See Estelle, 502 U.S. at 72.

2                    2.  Exclusion of Expert Testimony

3            Petitioner also argues that the erroneous admission of CSAAS testimony was

4    compounded when his expert was prohibited from testifying that other states prohibit CSAAS

5    testimony, thus giving the jury a "false sense of the syndrome's reliability."  ECF No. 1-1 at 50-

6    51.  To the extent petitioner is attempting to claim that the exclusion of his expert's testimony

7    was itself a due process violation, "the Supreme Court has not decided any case either 'squarely

8    address[ing]' the discretionary exclusion of evidence and the right to present a complete defense

9    or 'establish[ing] a controlling legal standard' for evaluating such exclusions."  Brown v. Horell,

10    644 F.3d 969, 983 (9th Cir. 2011) (alteration in original).  Absent controlling United States

11    Supreme Court authority, petitioner is not entitled to relief in federal court.  See Van Patten, 552

12    U.S. at 125-26.

13            Moreover, even assuming for the sake of argument that the trial court erred by excluding

14    petitioner's expert from testifying regarding the admissibility of CSAAS evidence in other states,

15    it cannot be said that this error "had substantial and injurious effect or influence in determining

16    the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v.

17    United States, 328 U.S. 750, 776 (1946)).  Though not permitted to testify regarding the

18    admissibility of CSAAS evidence in other states, petitioner's expert testified specifically about

19    the reliability of CSAAS evidence and explicitly challenged the position that recantation and

20    inconsistent allegations are common.  4 RT 1607-26.  He further testified regarding the failure to

21    account for false allegations and that CSAAS is "junk science" that is not generally accepted in

22    the scientific community of mental health professionals.  Id.  It therefore cannot be said that the

23    jury was presented with a false view of the reliability of CSAAS evidence or that the jury had no

24    basis upon which to find the evidence unreliable.

25                    3.  Jury Instruction

26            Finally, petitioner argues that prior to his expert's testimony, the jury was erroneously

27    instructed with CALCRIM No. 1193, which provided "that CSAAS evidence could be used 'only

28    in deciding whether or not a victim's conduct was not inconsistent with the conduct of someone

                                                    37

1   who has been molested and in evaluating the believability of a victim's testimony.'"  ECF No. 1-

2   1 at 51.  He asserts that the additional instruction that the testimony could be used to evaluate a

3   victim's believability impermissibly expanded the useable scope of the evidence.  Id.  However,

4   petitioner fails to explain how instructing the jury that CSAAS evidence could be used only for

5   the limited purpose of assessing a victim's credibility impermissibly expanded the usable scope of

6   the evidence, particularly in light of his concession that prior to deliberation the jury was

7   "correctly instructed with CALJIC No. 10.64."  Id.  CALJIC No. 10.64 provides a similar

8   instruction to CALCRIM No. 1193, but omits explicit language stating that CSAAS evidence

9   could be used to evaluate believability.  As the Court of Appeal pointed out, the language

10  regarding believability is "somewhat redundant.  The reason the evidence is admitted to show that

11  the victim's conduct is not inconsistent with having been molested is because inconsistent

12  conduct might otherwise be viewed as an indication that the victim's testimony about having been

13  molested lacks credibility."  Lodged Doc. 19 at 36 n.19 (citation omitted).

14        To the extent petitioner appears to imply that the instruction infringed on the presumption

15  of innocence, there is little reason to believe that the jury might have applied the instruction in a

16  way that violated petitioner's constitutional rights in this regard.  See Estelle, 502 U.S. at 72-73;

17  Donnelly, 416 U.S. at 643.  Before deliberation the jury was also instructed with CALJIC No.

18  10.64, which specified that the CSAAS evidence "must not be considered by you as proof that

19  any alleged victim's molestation claim is true," and that unlike the approach utilized in CSAAS

20  research, the jury was required "to presume the defendant innocent."  5 RT 1858; 3 CT 753.

21  Nothing about the evidence, arguments, or instruction in this case supports an inference that the

22  jury would have misapplied the earlier instruction to override those clear principles.

23                          4.   Conclusion as to Claim One

24        For all the reasons explained above, the California Court of Appeal's resolution of Claim

25  One, and all of its subparts, involved no objectively unreasonable findings of fact or objectively

26  unreasonable application of U.S. Supreme Court precedent.  Accordingly, this court lacks

27  authority to grant relief.

28  ////

II.     Claim Two: Exclusion of Evidence of the Victims' Mental Health Violated Due Process

    A.   Petitioner's Allegations and Pertinent State Court Record

Petitioner contends that the state court's exclusion of evidence and cross-examination related to the psychiatric diagnoses and treatment of four of the victims violated his rights to cross-examination, confrontation, and presentation of a defense.  ECF No. 1-1 at 57-73.  He asserts that four of the victims were diagnosed with Reactive Attachment Disorder (RAD) and that evidence of the diagnosis and treatment were relevant to (1) impeach credibility, (2) counter attempts to impeach LaValley's motive in referring children to the Daniels, (3) explain the Daniels' therapeutic relationship with the victims and dispel the idea that they ran a "cruel boot camp," and (4) cross-examine the prosecution's CSAAS expert regarding the application of CSAAS to children diagnosed with RAD.  Id. at 64.

Prior to trial, the petitioner subpoenaed medical records, including mental health records, for four of the victims: H.B.1, H.B.2, H.N., and K.N.  1 CT 88-110.  After reviewing the materials, the court determined that the victims' privacy interests did not outweigh petitioner's interest in obtaining the relevant records to defend against the charges and ordered production of the documents pursuant to a protective order.  1 RT 36-41.  Petitioner subsequently moved to admit evidence of the victims' "diagnosis, treatment (including medications) and observed conduct."  2 CT 379-391 (sealed).  This included evidence that all four girls had been diagnosed with RAD, two had also been diagnosed as being bi-polar, and three were taking powerful anti-psychotic medications.  2 CT 386-87 (sealed).  Petitioner also sought to admit evidence of observed conduct that included lying, manipulation, violent outbursts, destructive behavior, and independent masturbation.[15]  2 CT 379-391 (sealed).  He argued that "[k]nowing the mental health issues of these girls, including the conduct and medications taken, is extremely important to assessing whether each child should be believed."  2 CT 390 (sealed).  Petitioner also asserted

---

[15]  Evidence of the victims' independent masturbation was also the subject of hearings pursuant to Evidence Code sections 782 and 402 and its exclusion forms the basis of Claim Three of the instant petition, which is discussed in Section III below.

1   that the "mental health issues explain[ed] why their parents could not keep them at home, why

2   they [were] in respite care, why they receive[d] therapy on a weekly basis, why they [were]

3   taking strong anti-psychotic medications, and most importantly, their conduct" and that excluding

4   this evidence would "leave the jury with a false impression of who the girls are" and give them "a

5   false aura of credibility." 2 CT 410-12 (sealed).  The prosecution moved to exclude the evidence

6   of the diagnoses and medications prescribed as privileged and further argued that there was a lack

7   of foundation to support the diagnoses.  3rd Aug. RT 139-41 (sealed); 2 CT 401-03 (sealed).  The

8   prosecution also sought to exclude evidence of the victims' conduct on various grounds including

9   hearsay, lack of personal knowledge, improper character evidence, and relevance.  3rd Aug. RT

10   144-46 (sealed); 2 CT 397-401 (sealed).

11         After a hearing pursuant to Evidence Code § 402, at which Dr. Colley testified regarding

12   the effects of the various medications the victims had been prescribed during the relevant time

13   period, the court held that evidence of the medications the victims had taken that had the

14   "potential to interfere with the ability to perceive, accurately interpret, and/or remember events"

15   was admissible.  1 RT 272-364.

16         Prior to issuing a tentative ruling regarding the victims' diagnoses and conduct, the court

17   acknowledged concerns over redacting and creating a false impression regarding the victims'

18   behavior and why they were staying in petitioner's home.  1 RT 175.  The subsequent tentative

19   ruling held that reputation evidence as to lying, including that based upon hearsay, was

20   admissible with proper foundation, but specific acts of dishonesty were not admissible unless the

21   witness had personal knowledge and the victims could not be asked about specific incidents

22   unless there was evidence on the record that someone had personal knowledge.  2 CT 543-44

23   (sealed).  Evidence related to violent outbursts and destructive behavior was not admissible, even

24   if it related to why the victim was in respite care, because it was not clearly related to credibility.

25   2 CT 544-55 (sealed).  The ruling was subject to reconsideration in the event petitioner was able

26   to establish a foundation that K.N. and/or H.N. forced H.B.2 to masturbate, because then the

27   evidence could be used to "explain any fear or submission" by H.B.2.  Id.  With the exception of

28   H.N.'s masturbation, the court found that evidence of the victims' independent sexual conduct

was not admissible, but the ruling was subject to reconsideration if petitioner was able to present

a witness with personal knowledge of the conduct.  2 CT 546-48.  Finally, the court stated that

> [t]he victims' diagnoses are privileged and, therefore, inadmissible. A diagnosis and the resulting advice from the psychotherapist are expressly included in the definition of "confidential communication."  Although the diagnosis may have been disclosed to the patients' parents and caregivers, those disclosures are "reasonably necessary for . . . the accomplishment of the purpose for which the psychotherapist is consulted."  (Evidence Code Section 1012.)

> Thus, witnesses may be examined as to whether any of the children had particular traits of Reactive Attachment Disorder such as lying and/or manipulation without any mention being made of a particular diagnosis.

> As to the defense argument that sexual misconduct is a common symptom of Reactive Attachment Disorder, there is no evidence before the court that any victim in Exhibit A exhibited any act of molestation of another person or had a prior history of masturbation before arriving at the Daniels' home.  As to the complaining witnesses in this case, the fact that sexual misconduct is a common symptom of Reactive Attachment Disorder is irrelevant and inadmissible.

2 CT 546-47.  The tentative ruling was later adopted after additional argument from the parties.  2

RT 615-39.

### B.  The Clearly Established Federal Law

It is well established that "the Constitution guarantees criminal defendants 'a meaningful

opportunity to present a complete defense,'"  Holmes, 547 U.S. at 324 (quoting Crane v.

Kentucky, 476 U.S. 683, 690 (1986)), and "an *opportunity* for effective cross-examination,"

Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam).  However, neither right is absolute.

There is no requirement "that a defendant must be allowed to put on any evidence he chooses,"

LaGrand v. Stewart, 133 F.3d 1253, 1266 (9th Cir. 1998), or to cross-examination "that is

effective in whatever way, and to whatever extent, the defense might wish," Fensterer, 474 U.S.

at 20.

"[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to

impose reasonable limits on such cross-examination based on concerns about, among other

things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is

1   repetitive or only marginally relevant."  Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).  A

2   violation of the Confrontation Clause requires a showing that a criminal defendant "was

3   prohibited from engaging in otherwise appropriate cross-examination designed to show a

4   prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts

5   from which jurors . . . could appropriately draw inferences relating to the reliability of the

6   witness.'"  Id. (alteration in original) (quoting Davis v. Alaska, 415 U.S. 308, 318 (1974)).

7          States also have "broad latitude under the Constitution to establish rules excluding

8   evidence from criminal trials" so long as the rules "are not 'arbitrary' or 'disproportionate to the

9   purposes they are designed to serve,'" United States v. Scheffer, 523 U.S. 303, 308 (1998)

10  (citations omitted), and state rules limiting the admissibility of defense evidence are

11  constitutionally permissible where they permit the exclusion of evidence for which the "probative

12  value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or

13  potential to mislead the jury," Holmes, 547 U.S. at 326 (citations omitted).

14          C.  The State Court's Ruling

15         This claim was exhausted on direct appeal, and the last reasoned state court decision is the

16  opinion of the Court of Appeals.  That opinion is therefore the subject of review under § 2254(d).

17  Ortiz, 704 F.3d at 1034.

18         The state appellate court ruled in pertinent part as follows:

19              Defendant argues the trial court prejudicially erred in excluding
                evidence about the psychiatric diagnoses and treatment of four of the
20              victims.  Defendant maintains he was deprived of his constitutional
                rights to due process, compulsory process, confrontation, and a fair
21              trial.  We disagree.[n.21]

22                   n.21  We have reviewed the portions of the record sealed by
                     the trial court.
23

24              A.  Background

25              Before trial, the defense subpoenaed psychological, psychiatric,
                clinical, prescription, and other medical records of H.N., K.N.,
26              H.B.1, and H.B.2.  The victims asserted physician-patient privilege
                under Evidence Code section 992 (not at issue on appeal) and the
27              psychotherapist-patient privilege under Evidence Code section 1014.

28              The trial court reviewed the records in camera, found defendant's
                need for cross-examination outweighed state policies of privilege

and privacy, and provided the materials to both sides pursuant to a protective order and agreement to be bound.

The defense then moved to adduce evidence at trial of the psychiatric diagnoses and treatment of these four victims.  The defense asserted the evidence was important to test the victims' credibility because behaviors associated with these disorders included lying and framing others for their own misconduct.

After the trial court's tentative ruling to exclude the diagnoses, defendant asserted it needed the mental health diagnoses in order (1) to rebut any prosecution evidence that the Danielses ran a cruel "'boot camp'" for "naughty" children when in fact the Danielses were "educated" providers for children with mental health issues; (2) to rebut any prosecution attempt to impeach LaValley's motivation for referring children to the Danielses; and (3) to cross-examine the prosecution's expert about CSAAS's applicability to children with mental health issues.

The prosecutor disputed the proffered evidence and reiterated the privilege and privacy concerns.[n.22]

     n.22  For purposes of this appeal, we assume the evidence of diagnoses was reliable.

The trial court affirmed its tentative ruling that any diagnosis was privileged and inadmissible, but witnesses could be questioned as to whether any of the children had issues with lying or manipulation— which were traits of the diagnosed condition—without mentioning a particular diagnosis.

The trial court also ruled the defense could admit evidence about the medications prescribed for the victims that had the potential to affect perception, memory, and ability to recall, all going to credibility.

B.  <u>General Standards</u>

Defendant claims he was deprived of his constitutional rights to due process, compulsory process, confrontation, and a fair trial (U.S. Const., 5th, 6th, 14th Amends.).

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, [citation], or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, [citations], the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' [Citations.]  ('The Constitution guarantees a fair trial through the Due Process Clauses, but it defines basic elements of a fair trial largely through the several provisions of the Sixth Amendment')."  (<u>Crane v. Kentucky</u> (1986) 476 U.S. 683, 690 [90 L. Ed. 2d 636].)

"The Sixth Amendment to the [federal] Constitution guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.'  This right is secured for defendants in state as well as federal criminal proceedings . . . . [¶] . . . [¶]  Cross-

43

examination is the principal means by which the believability of a witness and the truth of his testimony are tested.  Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness."  (Davis v. Alaska (1974) 415 U.S. 308, 315-316 [39 L. Ed. 2d 347, 353].)

"'"[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" [Citations.]  However, not every restriction on a defendant's desired method of cross-examination is a constitutional violation.  Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance.   [Citation.]  California law is in accord. [Citation.]  Thus, unless the defendant can show that the prohibited cross-examination would have produced "a significantly different impression of [the witnesses'] credibility" [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment.'"  (People v. Carpenter (1999) 21 Cal. 4th 1016, 1050-1051 (Carpenter).)

C.  Analysis

"When a defendant proposes to impeach a critical prosecution witness with questions that call for privileged information, the trial court may be called upon, as in Davis [v. Alaska, supra, 415 U.S. at p.319], to balance the defendant's need for cross-examination and the state policies the privilege is intended to serve."  (People v. Hammon (1997) 15 Cal. 4th 1117, 1127 (Hammon).)

Evidence Code section 1014 states that a psychotherapy patient "whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and psychotherapist . . . ."  Evidence Code section 1012 states that "'confidential communication'" includes "a diagnosis made and the advice given by the psychotherapist in the course of that relationship."  The psychotherapist-patient privilege is not absolute but is broadly construed in favor of the patient.  (People v. Castro (1994) 30 Cal. App. 4th 390, 396-397, overruled on other grounds in People v. Martinez (1995) 11 Cal. 4th 434, 452.)  For example, in Castro, a prosecution for lewd conduct with a child, the trial court properly excluded testimony of child's therapist that the child was lying and her allegations were the projection of her own "'severe emotional problems.'"  The court held that the therapist's opinion that the victim suffered from "'severe emotional problems'" was a "'diagnosis'" with the meaning of Evidence Code section 1012 and therefore privileged.  (Castro, at p.397.)

Indeed, "'the use of psychiatric testimony to impeach a witness is

generally disfavored.' [Citations.]" (<u>People v. Anderson</u> (2001) 25 Cal. 4th 543, 575.) "It is a fact of modern life that many people experience emotional problems, undergo therapy, and take medications for their conditions. 'A person's credibility is not in question merely because he or she is receiving treatment for a mental health problem.' [Citation.]" (<u>Id.</u> at p.579.) <u>Anderson</u> was a murder case in which the trial court permitted a sometimes-delusional witness to testify about a prior uncharged murder committed by the defendant. (<u>Id.</u> at pp.570-571.) The Supreme Court held the trial court properly sustained a relevancy objection when defense counsel asked the witness if she was in therapy. (<u>Id.</u> at pp.578-579.) "Even if examination of a witness about treatment for mental illness might sometimes be relevant, here evidence that [the witness] had received therapy would have added little to the specific evidence, largely undisputed, that she had significant fantasies. Defense counsel was allowed to cross-examine [the witness] fully about the specific delusions that might impair the accuracy of her testimony. Nothing more was necessary." (<u>Id.</u> at p.579.)

In this case, defendant fails to show a constitutional violation. He argues the diagnoses were relevant. However, mere relevance is not the test. Rather, the inquiry is whether defendant had a need for cross-examination about specific psychiatric diagnoses sufficient to outweigh the state policies disfavoring cross-examination about psychiatric diagnoses and treatment. (<u>See Hammon</u>, <u>supra</u>, 15 Cal. 4th at p.1127.) Defendant must show that the prohibited cross-examination would have produced a significantly different impression of the witnesses' credibility. (<u>Carpenter</u>, <u>supra</u>, 21 Cal. 4th at pp.1050-1051.)

Defendant asserts the diagnoses were relevant (1) to impeach the victims' credibility, (2) to counter the prosecution's attempt to impeach LaValley's motivation in referring children to the Danielses, (3) to dispel the notion that the Danielses ran a "'cruel boot camp'" and to explain their "therapeutic" relationship with the children, and (4) to cross-examine the prosecution's CSAAS expert about CSAAS's application to children with these particular diagnoses.

As to defendant's first point about impeaching credibility, the diagnoses would be merely cumulative to the evidence that four of the victims had mental health problems. That testimony included testimony of the victims and their parents admitting that the children were sent to the Danielses' home because the children had behavioral and control problems that were beyond the adopted parents' ability to cope. The behavioral problems included lying and making up stories. This testimony corroborated Brenda Daniels' testimony that the children were out of control—lying, destructive, manipulative, and controlling. Additionally, the defense presented LaValley's testimony that the four victims were liars and manipulators and were seeing a psychiatrist who prescribed medications for them. A defense expert described these types of medications as being designed to control various psychiatric disorders and having potential side effects affecting memory. In closing argument, defense counsel repeatedly referred to the victims' having

45

"significant mental health issues" and taking "antipsychotic medications." Defendant fails to show he needed to identify any particular diagnosis.

As to defendant's fourth point, although defense counsel was precluded from asking the prosecution's CSAAS expert about application of CSAAS to children with particular psychiatric diagnoses, he was able to elicit that the expert was unaware of any studies as to whether CSAAS applied to children taking the types of medications which the jury learned had been prescribed for these victims.

As to defendant's second and third points—about LaValley's motivation in referring children to the Danielses and the "boot camp" perception—defendant fails to show how identification of any psychiatric diagnosis was necessary to his defense. Defendant was not charged with child abuse other than the sexual abuse. The relevance of the evidence was that (1) it provided further explanation for delayed disclosure of the molestations by children who feared defendant, and (2) it went to defendant's credibility. As the prosecutor argued to the jury, one victim testified she did not disclose the molestation right away because she assumed it was part of the punishment. As to defendant's credibility, the boot camp rumor led to the removal of the foster child and the license revocation, about which defendant's version of events (both before trial and during his trial testimony) differed from the social worker whom defendant threatened with a gun and the ALJ. In closing argument to the jury, the prosecutor used the discrepancies to attack defendant's credibility.

Defendant argues he should have been allowed to defend his use of seemingly harsh methods by showing that he attended a seminar and followed methods used by "therapy advocate" Nancy Thomas, though he admits those methods have been criticized by others. He argues that any dispute about their validity is "beside the point" here since the Danielses as well as the children's therapists and parents all relied upon them. However, it is not beside the point. On appeal, defendant himself refers to a website which states that Nancy Thomas has no formal training in psychotherapy and no academic credentials, and that the methods she advocates are considered by "many" child protective agencies as cruel and inhumane. (http://www.childrenintherapy.org/proponents/thomasn.html [as of June 25, 2015].) If defendant were allowed to present his evidence, the prosecution would have to be allowed to refute it and perhaps even introduce evidence of more recognized treatment strategies for the victims' diagnosed disorders, which would have resulted in a "trial within a trial" on a collateral matter.

Defendant offers a string of case citations for general legal principles, with little analysis. None helps his appeal. Citing Michigan v. Lucas (1991) 500 U.S. 145, 149 [114 L. Ed. 2d 205], defendant acknowledges the principle that the right to present defense witnesses and testimony is not absolute and must bow to accommodate other legitimate interests in appropriate circumstances. That rape case involved a Michigan state law authorizing preclusion of evidence of

a defendant's own past sexual relations with a victim, if the defendant failed to comply with the statute's notice-and-hearing requirement. The United States Supreme Court held the lower court erred in viewing preclusion as a *per se* violation of the Sixth Amendment. The notice-and-hearing requirement served legitimate state interests in protecting against surprise, harassment, and undue delay, and failure to comply "may in some cases justify even the severe sanction of preclusion." (Id. at p. 153.)

Defendant cites United States v. Valenzuela-Bernal (1982) 458 U.S. 858, 867, 871-873 [73 L. Ed. 2d 1193], for the general proposition that a state may not arbitrarily deny a defendant the ability to present relevant and material evidence that is vital to the defense. The court in that case held that the government's deportation of an alien witness did not violate the defendant's rights to compulsory process or due process, where the defendant did not present a plausible explanation of how the deported person's testimony would have been material and favorable to the defense. (Id. at pp.867, 871-873.)

Other cases cited by defendant are similarly unhelpful to his appeal. (Green v. Georgia (1979) 442 U.S. 95, 97 [60 L. Ed. 2d 738] [due process was violated in penalty phase of a death penalty case by exclusion of highly relevant and critical evidence that a witness heard an admission from another defendant who admitted killing the victim after sending the defendant on an errand]; Chambers v. Mississippi (1973) 410 U.S. 284, 302 [35 L. Ed. 2d 297] [due process was violated where trial court applied state law to preclude defendant from eliciting evidence that third party had admitted being the perpetrator]; Smith v. Illinois (1968) 390 U.S. 129 [19 L. Ed. 2d 956] [trial court denied defendant's confrontation right by precluding the defense from asking the principal prosecution witness for his true name and address after the witness admitted the name he gave was false]; Washington v. Texas (1967) 388 U.S. 14, 18-19 [18 L. Ed. 2d 1019] [Texas statute barring defendant from presenting accomplice as defense witness violated Sixth Amendment right to have compulsory process for obtaining witnesses]; Pointer v. Texas (1965) 380 U.S. 400 [13 L. Ed. 2d 923] [14th Amendment makes federal Confrontation Clause applicable to states].)

Here, the defense was allowed to elicit evidence of the victims' behaviors related to their mental health and the potential effect on the victims' credibility. The excluded evidence of particular diagnoses would not have produced a significantly different impression of the case, and the trial court's ruling did not violate defendant's constitutional rights.

Lodged Doc. 19 at 37-45 (alterations in original).

### D. Objective Reasonableness Under § 2254(d)

The United States Supreme Court has never held that the right to present a defense includes the right to attack a complaining witness's credibility without limitation. To the contrary, the Court has held in the due process context that reasonable limitations on defense

1  evidence may be imposed.  See Holmes, 547 U.S. at 326-27.  This includes limitations on cross-

2  examination.  Rock v. Arkansas, 483 U.S. 44, 55 (1987).

3          In this case the trial court did not impose an outright ban on evidence related to four of the

4  victims' psychiatric diagnoses and treatment, but instead limited the evidence that was

5  admissible.  During trial, H.B.1 and H.B.2's mother and H.N. and K.N.'s mother both testified

6  that their daughters suffered from behavioral problems that led them to hire therapist Mell

7  LaValley and ultimately place them in petitioner's home for respite care.  3 RT 881-82, 1031-32.

8  Testimony was elicited from both the victims' mothers and the victims that they had behavioral

9  problems that included lying and manipulation.  3 RT 897-98, 953, 1010, 1040, 1042.

10  Petitioner's wife, Brenda, also testified that all four victims were manipulative and "crazy liars,"

11  while LaValley testified that the four girls had behavioral problems that included lying and

12  manipulation.  4 RT 1243-47, 1376, 1380.

13          Petitioner's expert testified about various medications the victims were prescribed and that

14  they were approved or used off-label to treat conditions such as schizophrenia, bipolar mania,

15  autism, disruptive or aggressive behaviors in kids with autism, depression, and attention-deficit

16  hyperactivity disorder.  3 RT 1150-69.  He further testified that the medications had side effects

17  such as sedation, somnolence, and difficulty with memory and concentration.  Id.  During cross-

18  examination, the prosecution's CSAAS expert testified that CSAAS does not take into account

19  whether children were on medications such as the victims took or whether it would be applicable

20  to children on such medications.  3 RT 1108-09.  Petitioner's expert further testified that children

21  with cognitive or behavioral problems like oppositional defiant disorder, conduct disorder,

22  attention deficit disorder, and attention deficit disorder with hyperactivity "could have a higher

23  rate of suggestibility" and that children with schizophrenia had the highest rate of suggestibility.

24  4 RT 1623-24.

25          Here the trial court followed state rules designed to protect both the privacy rights of

26  persons with mental health problems, and weighed them against petitioner's right to cross-

27  examine.  See Cal. Evid. Code § 1014; People v. Hammon, 15 Cal 4th 1117, 1127 (1997).  The

28  United States Supreme Court has never held that these rules and procedures are constitutionally

1 infirm or that the psychotherapist-patient privilege yields to a criminal defendant's confrontation

2 rights.  Furthermore, petitioner has failed to establish that identification of the victims' specific

3 diagnoses was necessary to his defense.  The state appellate court determined that evidence of the

4 victim's specific diagnoses was cumulative and "would have resulted in a 'trial within a trial'"

5 with respect to whether the treatment petitioner and his wife provided was appropriate, which was

6 a collateral issue.  The exclusion of evidence on these grounds does not violate the Confrontation

7 Clause.  See Van Arsdall, 475 U.S. at 679.  In light of the evidence that was permitted, the state

8 appellate court's decision was not objectively unreasonable.   Section 2254(d) therefore bars

9 relief on Claim Two.

10    III.    Claim Three: Exclusion of Evidence of the Victims' Prior Sexual Conduct Violated

11            Due Process

12                A. Petitioner's Allegations and Pertinent State Court Record

13         Petitioner contends that the state court's exclusion of evidence regarding the victims'

14 independent sexual conduct violated his rights to cross-examination, confrontation, and

15 presentation of a defense and was prejudicial because it prevented him from presenting an

16 alternate explanation for the victims' allegations. ECF No. 1-1 at 73-76.  Petitioner's theory of

17 defense was that (1) the victims lied about the molestation and (2) K.N. and H.N. had a

18 preexisting masturbation problem, made H.B.1 and H.B.2 masturbate while at petitioner's home,

19 and exposed A.G. to sexual conduct.  Id. at 74.  Because K.N. and H.N.'s parents felt

20 masturbation went against the teachings of their church, K.N. and H.N. believed they would get

21 in trouble for masturbating and blamed petitioner because they disliked him and to cover their

22 own conduct.  Id. at 74-75.  Petitioner argues that the exclusion of evidence that any of the

23 victims other than H.N. independently masturbated before going to petitioner's home or while

24 living there made H.N.'s conduct appear insignificant and prevented him from presenting his

25 theory of defense.  Id. at 75-76.  Additionally, when the court sustained the prosecution's

26 objection to defense counsel's attempt to question petitioner's wife about her personal

27 observations of K.N.'s masturbation, petitioner was prevented "from establishing the lynch pin of

28 [his] theory—that K.N. forced others to masturbate at the Daniels' home" and from further

1   showing K.N.'s untruthfulness because it directly contradicted her testimony at the evidentiary

2   hearing.  Id. at 75.  Finally, petitioner alleges that appellate counsel was ineffective for failing to

3   raise the issue on appeal.  Id. at 76.

4         Prior to trial, petitioner moved to introduce evidence of K.N., H.N., H.B.1, and H.B.2's

5   independent sexual conduct and requested a hearing pursuant to California Evidence Code

6   § 782.[16]  1 CT 257-60 (motion to introduce evidence); 1 CT 252-56 (offer of proof – sealed); 2

7   CT 419-29 (ECF No. 1-2 at 109-62) (supplemental offer of proof – sealed); 2 CT 449-54 (request

8   for hearing – sealed).  Specifically, he sought to introduce evidence that K.N. and H.N.

9   masturbated prior to living at petitioner's home, that while at the home K.N. forced H.B.1 and

10   H.B.2 to masturbate, and that all four girls independently masturbated at petitioner's home.  2 CT

11   419-29.  The prosecution moved to exclude the evidence.  2 CT 405-09 (motion to exclude –

12   sealed), 482-85 (supplemental motion to exclude – sealed).  The trial court granted the request for

13   a section 782 hearing and all four girls testified.  1 RT 178, 211-46.

14         At the hearing, H.B.2 testified that she did not remember masturbating on her own,

15   whether K.N. ever made her masturbate, whether she ever told anyone that K.N. made her

16   masturbate, or whether anyone ever came into the bedroom at night because K.N. was

17   masturbating.  1 RT 213-14, 216, 218.  She denied that H.N. or H.B.1 ever made her masturbate.

18   1 RT 214.

19         H.B.1 testified that she never masturbated on her own; that K.N., H.N., and H.B.2 never

20   forced her to masturbate; and that she never saw K.N. masturbate.  1 RT 221-22, 224.  She also

21   testified that she did not know what "doing your hobby" meant and did not remember anyone

22   coming into the bedroom because someone was masturbating; she did not recall hearing petitioner

23   or his wife tell K.N. or any of the children to "Go do your hobby in the bedroom."  1 RT 223-24.

24         K.N. testified that she did not masturbate prior to living at petitioner's house; that H.N.,

25   H.B.1, and H.B.2 never made her masturbate; that she never told them to masturbate; that she did

26   not ever masturbate on her own; and that petitioner's wife, Brenda, never came into the bedroom

27

28   [16] Section 782 sets forth the procedure to be followed where the defendant seeks to introduce
evidence of the complaining witness's sexual conduct in order to attack her credibility.

because she or one of the other girls was masturbating.  1 RT 229-31, 234-35.  She also testified

that she did not remember telling LaValley or her mother that she masturbated or whether

petitioner's wife ever saw her masturbate or told her to "Go do [her] hobby," but that she thought

petitioner had said it in reference to masturbating even though she was not masturbating at the

time.  1 RT 231-33, 235.  K.N. also testified that her mother did not approve of masturbation and

would be mad if K.N. was caught masturbating.  1 RT 235-36.

H.N. denied ever masturbating before living at petitioner's house, but admitted that while

living there she did sometimes masturbate of her own volition.  1 RT 238-39.  She also testified

that K.N., H.B.1, and H.B.2 never made her masturbate and that she never made any of them

masturbate.  1 RT 240.  H.N. remembered petitioner and Brenda telling her and K.N. to "go do

your hobby," that it meant to go masturbate, and that neither of them was masturbating at the

time.  1 RT 241-242.  She also testified that she never saw any of the other girls masturbate and

that she never masturbated when the other girls were around, but that petitioner came into the

bedroom on a few occasions because someone was masturbating though she could not remember

who.  1 RT 242-45.

The defense argued upon conclusion of the § 782 hearing that the girls' denials,

particularly K.N's, also went toward their credibility because it contradicted the evidence—

almost exclusively LaValley's therapy notes—indicating that they independently masturbated.  1

RT 247-49, 253-57.  The prosecution argued that there were foundational issues with LaValley's

records because so many people were present during the therapy sessions and there was no

indication as to who provided the information contained in the notes.  1 RT 249-53.  The court

determined that it was necessary to hear from LaValley and H.N. and K.N.'s parents and ordered

a further hearing under Evidence Code section 402.[17]  1 RT 265-67.

H.N. and K.N.'s mother, Karyn, testified that other than one or two times when K.N. was

four or five, she did not recall either girl masturbating.  2 RT 418, 434, 464-65.  She also testified

that while she remembered her husband, petitioner, and Brenda being present during therapy

_____

[17]  Section 402 permits the court to hold hearings outside the presence of the jury to determine the admissibility of evidence.

sessions with LaValley, she did not recall whether the girls were also present, nor did she recall having any discussions about masturbation or the bases for her responses to questionnaires regarding K.N.'s behavior.  2 RT 416-20, 426-34, 437-40, 444-46, 465-67.  Karyn also testified that she did recall petitioner and Brenda telling her that K.N. was masturbating and they told her to "practice your hobby" and sent her to the bathroom or bedroom, but that she did not believe that K.N. was masturbating.  2 RT 418-19.  She also recalled a time when petitioner came into the room and said that H.B.1 and H.B.2 had just told him that K.N. was forcing them to masturbate, and that while she did not believe that that had happened, she temporarily pulled the girls out of respite care to protect herself.  2 RT 422-24, 452.

The girls' father, Dee, testified that he was present at some therapy sessions and recalled that Karyn, petitioner, Brenda, and the girls were also present, though he could not recall if both girls were ever present at the same time.  2 RT 472-73.  He also testified that he recalled Brenda claiming that K.N. was masturbating, but did not recall K.N. ever being present for those discussions.  2 RT 474-76.  Dee testified that he was not aware of K.N. masturbating prior to going to petitioner's home and did not discuss masturbation with either girl.  2 RT 475, 479.

Mell LaValley testified that the girls would be present at their therapy sessions, as well as petitioner and/or Brenda, and that Karyn was also there for many sessions, but she did not recall Dee attending any sessions at petitioner's house.  2 RT 505, 514.  She also testified that she did not record who was in attendance at each session.  2 RT 519.  LeValley could not recall whether masturbation was discussed when the girls were present, who provided the information, or whether K.N. admitted to masturbating, though she recalled that K.N. never denied that she was masturbating.  2 RT 506-11, 514-15, 517-26, 528-29, 539-40.  She did not ever witness any of the girls masturbating.  2 RT 534.

After hearing additional argument on the matter, 2 RT 573-611, the court issued the following tentative ruling:

> **Issue:** Can the defense make mention, before the defense case, of any of the victims' other sexual conduct or their claim that [K.N.] forced anyone else to masturbate?
>
> **Ruling:** The only evidence admissible pursuant to Evidence Code

Section 782 is addressed below in the court's Ruling under the Issue entitled "Is evidence admissible that [H.N.] masturbated."

The evidence at the 782 hearings showed that none of the girls will testify that [K.N.] made them masturbate.  The Court rules that this purported evidence that [K.N.] forced anyone to masturbate is not admissible in the People's case in chief—either on direct or on cross-examination.

As to the defense case, if the Defense presents witnesses with personal knowledge that one or more of the girls made any of the other girls masturbate, the Court will reconsider this issue.  The complaining witnesses will remain subject to recall.

. . .

**Issue:** Are the following statements admissible: 1) that [K.N.] "places current people in previous molest situations—false accusations of current people esp. men" and 2) [K.N.] is "Verbally manipulating" in response to the question at number 77 which asks if the child "forces others into things they do not want to do (sexually or criminally).  These statements were written about [K.N.] in April 2004 when she was receiving respite care at the Daniels' home.

**Ruling:** As to these statements, the Court finds that at this point there is insufficient showing of anyone with personal knowledge to lay the requisite foundation for these statements to be admissible.  The prejudice to be suffered and the likely confusion to be created outweigh any probative value and, thus, the Court exercises its discretion to exclude these statements under Evidence Code Section 352.

The testimony at the 782 hearings shows that this information would not be probative because all of the girls deny that [K.N.] ever forced them to masturbate.  Since [K.N.] was not asked about her placing people in previous molestation situations (which the Court notes it was defendant's burden to do), all that the Court has to consider is Karyn [N.]'s testimony that she did not know whether that information was based on her personal knowledge or hearsay.  This evidence does not tend to prove or disprove [K.N.]'s credibility relating to the charged offenses.  On the other hand, as noted, the risk of prejudice and confusion are significant.  The Court rules that without more, this evidence is not admissible in the People's case in chief—either on direct or on cross-examination.

As to the defense case, if the Defendant elects to testify and wants to attack [K.N.]'s credibility as to what he saw [K.N.] do based on his own accusations based on his own personal knowledge, the Court will reconsider this ruling.  If the defense elects to present witnesses with personal knowledge with respect to this information, the court will reconsider this issue.  The complaining witnesses will remain subject to recall.

**Issue:** Is evidence admissible that [H.N.] masturbated?

**Ruling:** The evidence regarding [H.N.] masturbating to explain her medical condition is relevant for a non-character purpose, to explain her medical condition, and therefore is admissible for that purpose. In addition, this evidence is relevant to the defense theory that [H.N.] masturbated on her own, and of her own volition, and not because Defendant forced her to do so at the time of the events charged in the information.   Therefore, this evidence is admissible for a non-character, credibility purpose under Evidence Code Section 782.  The Court has considered Evidence Code Section 352.

**Issue:** Is evidence admissible as recorded in the LaValley notes at page 214-215 from August 16, 2002 that [H.N.] was touching [K.N.] and [A.N.].[18]

**Ruling:**  Karyn [N.] testified she did not remember telling Mell LaValley this information and that she did not remember if [H.N.] was touching [K.N.] and [A.N.] in inappropriate ways.  (37:21-25)  The Court rules that without more, this evidence is not admissible in the People's case in chief—either on direct or cross-examination.

If the defense elects to present witnesses with personal knowledge with respect to this information, the court will reconsider this issue.  Karyn Nash will remain subject to recall.

2 CT 546-48.  The tentative ruling was adopted after additional argument.  2 RT 615-39.  The court noted that it "did spend a lot of time reviewing the evidence and case law and the Evidence Code, and these rulings simply reflect the Court's concern that there be competent evidence based on personal knowledge."  2 RT 638.

During trial, petitioner's attorney attempted to elicit testimony from petitioner's wife about her personal observations of K.N.'s masturbation, which resulted in the following exchange:

Q: Any other issues with [K.N.]?

A: All four girls masturbated.

MS. MACY: Objection, your Honor.  Move to strike.

THE COURT: Motion to strike granted.

Q: (By MR. CHASTAINE): Are these things that you observed?

A: Yes.

Q: So did you personally observe, for example, [K.N.] masturbate?

MS. MACY: Objection.  In limine rulings.

---

[18]  A.N. was H.N. and K.N.'s younger sister.

54

1    THE COURT: Sustained.

2    4RT 1254.

3    After the trial, petitioner filed a motion for a new trial based in part on the exclusion of

4    evidence of the victims' independent sexual conduct.  4 CT 810-812.  The motion was denied.  5

5    RT 1983.

6    B.  The Clearly Established Federal Law

7    1.  Exclusion of Evidence

8    While "the Constitution guarantees criminal defendants 'a meaningful opportunity to

9    present a complete defense,'" Holmes, 547 U.S. at 324 (quoting Crane, 476 U.S. at 690), states

10   have "broad latitude under the Constitution to establish rules excluding evidence from criminal

11   trials" so long as the rules "are not 'arbitrary' or 'disproportionate to the purposes they are

12   designed to serve,'" Scheffer, 523 U.S. at 308 (citations omitted).  State rules limiting the

13   admissibility of defense evidence are constitutionally permissible where they permit the exclusion

14   of evidence for which the "probative value is outweighed by certain other factors such as unfair

15   prejudice, confusion of the issues, or potential to mislead the jury," Holmes, 547 U.S. at 326

16   (citations omitted).  Moreover, while the Sixth Amendment guarantees a right to cross-

17   examination, there is no entitlement to cross-examination "that is effective in whatever way, and

18   to whatever extent, the defense might wish," Fensterer, 474 U.S. at 20, and "trial judges retain

19   wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on

20   such cross-examination based on concerns about, among other things, harassment, prejudice,

21   confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally

22   relevant," Van Arsdall, 475 U.S. at 679.

23   2.  Ineffective Assistance of Counsel

24   A criminal defendant enjoys the right to effective assistance of counsel on appeal.  Evitts

25   v. Lucey, 469 U.S. 387, 396 (1985).  To establish a constitutional violation based on ineffective

26   assistance of counsel, a petitioner must show (1) "that counsel's representation fell below an

27   objective standard of reasonableness," and (2) that counsel's deficient performance prejudiced the

28   defense.  Strickland Washington, 466 U.S. 668, 688, 692 (1984).  "The proper measure of

55

1  attorney performance [is] simply reasonableness under prevailing professional norms."  Id. at

2  688.  Prejudice means that the error "actually had an adverse effect on the defense" and that there

3  is "a reasonable probability that, but for counsel's unprofessional errors, the result of the

4  proceeding would have been different."  Id. at 693-94.

5          C.   The State Court's Ruling

6      Because the California Supreme Court denied review without comment or citation, the

7  denial of the claim was on the merits.  Richter, 562 U.S. at 99; see also Johnson v. Williams, 568

8  U.S. 289, 301 (2013).  There is no reasoned decision of a lower state court addressing this claim.

9          D.   Objective Unreasonableness Under § 2254(d)

10     Because the state court denied the claim on the merits but without explanation, this court

11 must determine whether there is any objectively reasonable basis for a denial under clearly

12 established federal law.  Richter, 562 U.S. at 102.

13             1.   Exclusion of Evidence

14     Here, summary denial was perfectly consistent with clearly established federal law.  The

15 United States Supreme Court has never held that the right to present a defense includes the right

16 to attack a complaining witness's credibility without limitation.  To the contrary, the Court has

17 held in the due process context that reasonable limitations on defense evidence may be imposed,

18 see Holmes, 547 U.S. at 326-30, and the limitations imposed on the admission of evidence and

19 petitioner's cross-examination of H.N., K.N., H.B.1, and H.B.2 were appropriate for the reasons

20 explained by the state trial court.

21     Under California law, "[e]vidence of the sexual conduct of a complaining witness is

22 admissible in a prosecution for a sex-related offense only under very strict conditions," though it

23 may be admissible "when offered to attack the credibility of the complaining witness, provided

24 that its probative value outweighs the danger of undue prejudice and the defendant otherwise

25 complies with the procedures set forth in Evidence Code section 782."  People v. Fontana, 49 Cal.

26 4th 351, 354, 362 (2010).  Additionally, to be admissible, a witness's testimony must be based on

27 personal knowledge.  Cal. Evid. Code § 702(a).

28     The exclusion of evidence regarding K.N. forcing H.B.1 and H.B.2 to masturbate was

56

1    properly excluded for lack of personal knowledge.  See Scheffer, 523 U.S. at 310 ("State and

2    Federal Governments unquestionably have a legitimate interest in ensuring that reliable evidence

3    is presented to the trier of fact in a criminal trial.  Indeed, the exclusion of unreliable evidence is a

4    principal objective of many evidentiary rules.").  K.N. denied that she made anyone else

5    masturbate, and all the girls denied that they were forced to masturbate by one of the other girls.[19]

6    1 RT 214, 221-22, 230-31, 240.  The only evidence to support this theory was petitioner's

7    allegation that H.B.1 and H.B.2 told him K.N. forced them to masturbate.  However, trial counsel

8    admitted that "we don't have anyone that saw [K.N.] force [H.B.2] and [H.B.1] to masturbate"

9    and that petitioner's "ability to testify about that hearsay statement could potentially be

10    problematic."  2 RT 617.  Because petitioner presented no witness with personal knowledge that

11    H.N. or K.N. forced others to masturbate, testimony on the matter was not admissible and

12    limiting cross-examination under California's discretionary evidence rules was not an

13    unreasonable application of clearly established federal law.  There is no constitutional violation in

14    the trial court's application of state's evidentiary rules unless they were applied arbitrarily or in a

15    manner disproportionate to the purposes they were designed to serve, see Holmes, 547 U.S. at

16    326-27, and in this case, exclusion served legitimate goals of ensuring reliable evidence and

17    preventing harassment and did not impair petitioner's constitutional rights.

18       Petitioner also claims that his rights were violated when evidence that K.N., H.B.1., and

19    H.B.2 independently masturbated was improperly excluded and that he was prevented from

20    eliciting testimony that Brenda personally observed K.N. masturbating when the court sustained

21    the prosecution's objections.  ECF No. 1-1 at 75.  He argues that this exclusion prevented his

22    ability to establish "the lynch pin of [his] theory—that K.N. forced others to masturbate at the

23    Daniels' home."  Id.  However, even if petitioner was able to produce witnesses with personal

24    knowledge that the girls masturbated on their own, that does not translate into evidence that K.N.

25    forced the others to masturbate.  Furthermore, to the extent petitioner claims evidence of

26

27    [19]  Though the petition states that petitioner theorized that H.N. also forced others to masturbate,
     the supplemental offer of proof refers only to evidence of K.N. forcing others to masturbate.  2

28    CT 419-29.

1  independent masturbation would have showed K.N.'s untruthfulness by contradicting her

2  testimony at the evidentiary hearing, it would have been redundant—there was significant

3  evidence, including K.N.'s own admission, that K.N. had issues with lying.  See 3 RT 1010 (K.N.

4  admitting to lying and that it was part of why she was at petitioner's home), 1040 (K.N.'s mother

5  acknowledging K.N. and sister would lie), 1042 (K.N.'s mother admitting K.N. had a problem

6  with frequent lying), 1044-45 (K.N.'s mother stating that she did not contact police after K.N.'s

7  first claim of molestation she believed Brenda's claim it was not true); 4 RT 1244 (Brenda

8  testifying that K.N. was a "crazy liar"), 1258 (Brenda stating that K.N. admitted to lying about

9  petitioner molesting her the first time she made the allegation), 1376 (LeValley testifying K.N.

10  had issues with lying), 1380 (LeValley tstifying K.N.'s lying was covered in therapy), 1381-82

11  (LeValley stating that K.N. admitted to lying about petitioner molesting her the first time she

12  made allegation and that LeValley did not report because she believed K.N. had lied).

13       The exclusion of evidence that the girls independently masturbated, under California's

14  discretionary evidence rules, was not objectively unreasonable under clearly established federal

15  law.  The prevention of harassment and protection of sexual privacy are well-established grounds

16  for reasonable restriction of cross-examination.  See Van Arsdall, 475 U.S. at 679; Michigan v.

17  Lucas, 500 U.S. 145, 150 (1991) (recognizing state's rape-shield statute represented "valid

18  legislative determination that rape victims deserve heightened protection against surprise,

19  harassment, and unnecessary invasions of privacy").  Here, the trial court followed state

20  procedures designed to protect both the confrontation rights of defendants and the privacy rights

21  of complainants on sex cases, see Cal. Evid. Code, § 1103(c); Fontana, 49 Cal. 4th at 362-63, and

22  the United States Supreme Court has never held that these rules and procedures are

23  constitutionally infirm.  Furthermore, defense counsel elicited significant evidence of K.N.'s

24  penchant for lying during trial, and any additional impeachment value of the excluded evidence

25  would have been cumulative.  See Williams v. Woodford, 384 F.3d 567, 599 (9th Cir.2004)

26  (when a defense effectively calls into question the truthfulness of a witness during trial and

27  further impeachment by withheld evidence "would not have cast [the witness] in a significantly

28  worse light" the withheld evidence is not normally prejudicial.).  Even assuming the impeachment

1   evidence was improperly excluded, in the context of petitioner's trial as a whole, the exclusion

2   did not so infect the proceedings as to render them fundamentally unfair.  See Estelle, 502 U.S. at

3   72

4        Ultimately, because "the Supreme Court has not decided any case either 'squarely

5   address[ing]' the discretionary exclusion of evidence and the right to present a complete defense

6   or 'establish[ing] a controlling legal standard' for evaluating such exclusions," Brown v. Horell,

7   644 F.3d 969, 983 (9th Cir. 2011) (alteration in original) (quoting Moses v. Payne, 555 F.3d 742,

8   758-59 (9th Cir. 2009)), the California Supreme Court's summary denial of petitioner's claim did

9   not violate the federal constitution and is not contrary to or an unreasonable application of clearly

10  established United States Supreme Court precedent.  That judgment therefore may not be set

11  aside.  See Knowles v. Mirzayance, 556 U.S. 111, 122 (2009) ("it is not 'an unreasonable

12  application of' 'clearly established Federal law' for a state court to decline to apply a specific

13  legal rule that has not been squarely established by [the United States Supreme] Court" (citations

14  omitted)); Van Patten, 552 U.S. 120, 126 (2008) (per curiam) (state court cannot be said to have

15  unreasonably applied clearly established Federal law when the Supreme Court's decisions have

16  given "no clear answer to the question presented, let alone one in [the petitioner's] favor" and

17  relief is therefore "unauthorized" under § 2254(d)(1) (quoting Carey v. Musladin, 549 U.S. 70, 77

18  (2006)).

19        2.  Ineffective Assistance of Counsel

20        In light of the foregoing analysis regarding the merits of petitioner's claim that his rights

21  were violated by the exclusion of evidence of the victims' independent sexual conduct, the

22  California Supreme Court's denial of petitioner's ineffective assistance of counsel claim was not

23  contrary to or an unreasonable application of established federal law.  "[A]ppellate counsel who

24  files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select

25  from among them in order to maximize the likelihood of success on appeal."  Smith v. Robbins,

26  528 U.S. 259, 288 (2000).  Counsel's performance will therefore only be found deficient if "a

27  particular nonfrivolous issue was clearly stronger than issues that counsel did present."  Id.

28  Because petitioner cannot demonstrate that this claim was "clearly stronger" than the other claims

1   raised by appellate counsel or that there was a "reasonable probability of reversal" had the claim

2   been raised, there can have been no unreasonable performance by appellate counsel or prejudice

3   in failing to raise it.  See Miller v. Keeney, 882 F.2d 1428, 1435 (9th Cir. 1989) ("Because

4   [petitioner] had only a remote chance of obtaining reversal . . . he cannot satisfy either of the

5   Strickland prongs: Appellate counsel was not ineffective for failing to raise the issue, and

6   [petitioner] suffered no prejudice on account of counsel's performance.").  This claim should

7   therefore be denied.

8       IV.    Claim Four: Insufficient Evidence for Counts 8 through 12

9           A.  Petitioner's Allegations and Pertinent State Court Record

10         Petitioner contends that H.B.1 and H.B.2's testimony was insufficient to support

11   conviction on Counts 8 through 12.  ECF No. 1-1 at 76-80.  He argues that it was impossible for

12   the testimony of both H.B.1 and H.B.2 to be true, because H.B.1 testified that no one was ever

13   present when she was molested while H.B.2 testified that she and H.B.1 were usually together

14   when H.B.2 was molested.[20]  Id. at 77-78.  Petitioner asserts that the irreconcilable difference in

15   testimony and H.B.2's additional testimony that she remembered most of what happened from her

16   "visions" should shake the court's moral confidence in the convictions.  Id. at 78.  He further

17   argues that H.B.1 made outlandish claims during her SAFE interview, some of which she

18   backtracked on during trial, and that because "such outrageous claims cannot be viewed as

19   truthful, the generic testimony of molestation cannot be trusted."  Id. at 79-80.

20         Counts 8 and 9 were for touching H.B.1's vagina in the bathroom, while Count 10 was for

21   touching H.B.1's vagina on or about her birthday.  2 CT 516-17 (Second Amended Information).

22   Counts 11 and 12 were for directing H.B.2 to touch herself.  2 CT 517-18.

23         At trial, H.B.1 testified that she was fourteen years old and lived at petitioner's house

24   from the time she was about five-and-a-half until she was seven.  3 RT 799, 801-02.  She further

25   testified that she was scared of petitioner and that he would come into the bathroom while she

26

---

[20]  The California Court of Appeals identified the older sister as H.B.1 and the younger sister as
27   H.B.2.  Lodged Doc. 19.  Petitioner has transposed this identification.  ECF No. 1-1.  This court
continues to identify the sisters in the same manner as the appellate court.  The difference in
28   attribution of testimony is immaterial to the issues presented.

1    was in there, tell her to lay on the floor and take off her clothes, and touch her once her clothes

2    were off.  3 RT 805-10.  When asked where petitioner would touch her, H.B.1 became non-

3    responsive, but eventually admitted that he touched her vagina.  3 RT 812-15.  She testified that

4    when this would happen most times she would shut down and she "didn't let [herself]

5    remember."  3 RT 806-07, 815-16.  When asked about being touched by petitioner on her

6    birthday, H.B.1 testified that she had been on the bed in the master bedroom, before becoming

7    largely unresponsive to questions regarding the incident.  3 RT 818-22.  During cross-

8    examination, defense counsel asked H.B.1 about statements she made during her SAFE interview

9    that all the girls had been forced to act out sexually with each other, that petitioner had stabbed

10   his wife in the shoulder, that petitioner's mother tried to set the house on fire many times by

11   putting foil in the microwave, that petitioner forced her to have sex with his son on two occasions,

12   and that it was on the news that petitioner had abused 150 girls and been found with pornography

13   on his computer.  3 RT 829-30, 835-41.  She responded that others told her about acting out

14   sexually with the other girls, petitioner stabbing his wife, and petitioner being on the news; that

15   she did not recall being forced to act out with any other girls; that she remembered being forced

16   to have sex with petitioner's son; and that the first time petitioner's mom tried to set the house on

17   fire might have been an accident, but the other times were obviously on purpose.  Id.

18        A recording of part of H.B.1's SAFE interview was also played for the jury.  3 RT 920.

19   During the interview, H.B.1 stated that petitioner told her he had a surprise for her on her birthday

20   and took her into the master bedroom where he had her lay on the bed while he put his finger in

21   her vagina.  2 CT 598-600; 3 CT 601-02.  She stated that while petitioner molested her she was

22   watching the fish and it was the only time that he ever touched her in that room.  2 CT 589; 3 CT

23   602.

24        H.B.2 testified that she was thirteen years old and that she began living at petitioner's

25   house when she was five, and stayed for about one year.  3 RT 848, 850, 852.  When asked

26   whether anything inappropriate ever happened to her at petitioner's house, H.B.2 stated that

27   petitioner "made us touch ourselves" before she began crying and stated, "I can't do this."  3 RT

28   853-54.  She then testified that petitioner would take her into an office where he would tell her to

1   take off her clothes and lay on the floor.  3 RT 855-56.  Then he would have her put Vaseline on

2   her hands and touch her vagina.  3 RT 856-58.  H.B.1 was usually with her when this happened.

3   3 RT 855.  H.B.2 testified that petitioner did not ever touch her and she did not ever have to touch

4   him.  3 RT 860.  On cross-examination, H.B.2 testified that she remembered most of what

5   happened from "dreams and visions," that she had visions "[a] couple of times a week," and that

6   the contents of the visions depended on what she was feeling.  3 RT 867-68.  She explained that

7   "[a] vision is when you see things during the day and when you're not asleep."  3 RT 877.

8               B.  The Clearly Established Federal Law

9   Due process requires that each essential element of a criminal offense be proven beyond a

10  reasonable doubt.  In re Winship, 397 U.S. 358, 364 (1970).  In reviewing the sufficiency of

11  evidence to support a conviction, "the relevant question is whether, after viewing the evidence in

12  the light most favorable to the prosecution, *any* rational trier of fact could have found the essential

13  elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319

14  (1979).  If the evidence supports conflicting inferences, the reviewing court must presume "that

15  the trier of fact resolved any such conflicts in favor of the prosecution," and the court must "defer

16  to that resolution."  Id. at 326.  "A reviewing court may set aside the jury's verdict on the ground

17  of insufficient evidence only if no rational trier of fact could have agreed with the jury."  Cavazos

18  v. Smith, 565 U.S. 1, 2 (2011) (per curiam).

19              C.  The State Court's Ruling

20          This claim was exhausted on direct appeal, and the last reasoned state court decision is the

21  opinion of the Court of Appeals.  That opinion is therefore the subject of review under § 2254(d).

22  Ortiz, 704 F.3d at 1034.

23          The state appellate court ruled in pertinent part as follows:

24              Defendant contends the evidence as to Counts 8 through 12 was
                constitutionally insufficient.  We disagree.

25

26              A.  Standard of Review

27              Convictions must be supported by substantial evidence, i.e.,
                "evidence which is reasonable, credible, and of solid value—such
                that a reasonable trier of fact could find the defendant guilty beyond
28              a reasonable doubt."  (People v. Johnson (1980) 26 Cal. 3d 557, 577-

                                             62

578.) On appeal, we view the evidence in the light most favorable to the judgment and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (Jackson v. Virginia (1979) 443 U.S. 307, 319 [61 L. Ed. 2d 560, 573]; Johnson, at p.576.)  "Conflicts and *even testimony which is subject to justifiable suspicion* do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends."  (People v. Maury (2003) 30 Cal. 4th 342, 403; see also People v. Barnes (1986) 42 Cal. 3d 284, 306, italics added.)

In People v. Jones (1990) 51 Cal. 3d 294 (Jones), the court held that generic testimony in child sexual abuse cases is constitutionally sufficient, as long as the complaining witness describes: (1) the kind of act or acts committed with sufficient specificity to assure it was an unlawful act and a specific type of proscribed conduct; (2) the number of acts with sufficient certainty to support each of the alleged counts; and (3) the general time period in which the acts occurred to assure they were committed within the applicable statute of limitations.  (Id. at p.316.)

B.  Counts 8, 9, and 10—H.B.1

These are two counts of touching H.B.1's vagina in the bathroom and one count of touching her vagina on her birthday.

Defendant acknowledges the evidence was "supposedly constitutionally sufficient" under Jones.  He acknowledges it is the exclusive province of the jury to determine witness credibility and the truth or falsity of the facts upon which that determination depends.  (Jones, supra, 51 Cal. 3d at p.314)  He nevertheless argues the moral sense of this court should be "shock[ed]" by the conviction. He cites People v. Watts (1999) 76 Cal. App. 4th 1250, which stated an appellate court will not reject a witness's testimony, believed by the jury, unless there is a physical impossibility the statement is true, or the statement shocks the moral sense of the court, or the statement's inherent improbability plainly appears.  (Id. at pp. 1258-1259.)

Defendant argues our moral sense should be shocked, because H.B.1 made the following "outlandish" claims in her SAFE interview:

(1) That she and other girls had been forced to rub up against each other, whereas the others denied any such event;

(2) That defendant stabbed Brenda with a knife, splitting her shoulder open;

(3) That defendant's mother deliberately tried to set the house on fire (by putting foil in the microwave) because she was mean;

(4) That defendant forced her to "have sex" twice with a boy in the house, age 12 or 13, though her genital examination was normal; and

1    (5) That it was on the news that defendant abused 150 girls and had pornography on his computer, though no pornography was found.

2

3    Defendant says the victim "backtracked" at trial, testifying:

(1) She did not remember whether she had acted out sexually but H.N. told her it happened;

4

5    (2) She heard about Brenda being stabbed from others, though she did not say so in the SAFE interview;

6

7    (3) The first microwave fire may have been an accident, but the others were not;

8    (4) Perhaps she heard about the 150 girls and pornography from DeRose or DeRose's computer rather than seeing it on the news.

9

10    None of the points raised by defendant present a physical impossibility that defendant molested this victim, nor do they shock our moral sense.

11

12    C.  <u>Counts 11 and 12—H.B.2</u>

13    These counts alleged defendant directed H.B.2 to touch her vagina. Again, defendant acknowledges the evidence is constitutionally sufficient, but he argues our moral sense should be shocked because H.B.2 said H.B.1 was usually present, and H.B.1 testified to the contrary that she was always alone when molested and never saw defendant do it with anyone else.  Defendant argues that, when one additionally considers that H.B.2 had "visions," moral confidence in the verdicts should be shaken.

14

15

16

17    Defendant's appellate argument overlooks the testimony that H.B.1 testified she would "shut down" and try to block it out when the molests occurred and tried not to let herself remember.  The jurors could have reasonably inferred that this—as well as the passage of time for these young victims—may have explained why H.B.1 and H.B.2 had different recollections.

18

19

20

21    The jury was able to listen to the testimony of these witnesses and observe their demeanor, facial expressions, and emotional responses. The record indicates that testifying in court was difficult for the girls.

22

23    We conclude substantial evidence supports the convictions on all counts.

24  Lodged Doc. 19 at 45-48 (alteration in original).

25    D.  <u>Objective Unreasonableness Under § 2254(d)</u>

26    In rejecting petitioner's sufficiency of the evidence claim, the state appellate court viewed

27  the evidence in the light most favorable to the state court judgment and considered all reasonable

28  inferences in support of that judgment in accordance with the <u>Jackson</u> standard.  The state court

reasonably found that none of the statements petitioner takes issue with rendered the claims of molestation a physical impossibility.  Nor was it unreasonable to find that the statements did not shock the moral sense such that confidence in the verdict should be shaken.  As the appellate court explained, a jury could have inferred that the passage of time, the age of the victims, and the fact that H.B.1 testified that she often shut down accounted for the differing recollections.  The appellate court also pointed out that, in addition to listening to the witnesses' testimony, the jury was also able to "observe their demeanor, facial expressions, and emotional responses" and that "[t]he record indicates that testifying in court was difficult for the girls."  Lodged Doc. 19 at 48. It was therefore not unreasonable to find that a jury believed H.B.1 and H.B.2's testimony that petitioner had molested them, despite the inconsistencies regarding details immaterial to the verdict.[21]  Furthermore, even if a H.B.1's claims were "outlandish," the record is replete with evidence that the victims were troubled girls who problems with lying and manipulation.  It is not unreasonable to find that a jury could have believed that H.B.1 lied about many things but did not lie about being molested.

The state court's rejection of the claim on this basis was consistent with, and a reasonable application of the Jackson standard, which requires that any rational trier of fact could have found true beyond a reasonable doubt that petitioner molested H.B.1 and H.B.2.  See Jackson, 443 U.S. at 319.  Particularly in light of the "double dose of deference" to the verdict that is required under Jackson and the AEDPA, Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir. 2011), federal habeas relief is unavailable.

V.   Claim Five: Uniformed Officer Stationed by Petitioner

A.  Petitioner's Allegations and Pertinent State Court Record

Petitioner alleges that his rights to a fair trial, impartial jury, and due process were violated when the court stationed a uniformed officer within two to three feet of him at all times without first making an individualized finding of necessity.  ECF No. 1-1 at 80-88.  He argues

---

[21]  Though not a reason provided by the appellate court, it would not be unreasonable to conclude that a jury interpreted H.B.2's claim that she had "visions" as describing vivid or intrusive memories of traumatic events.

1   that although the court advised the jury that the officer's presence was a standard operating

2   procedure of the court that had no bearing on petitioner's guilt, the officer's placement was

3   inherently prejudicial and sent a message that petitioner was a threat or posed a flight risk, when

4   he in fact had no criminal record, had demonstrated exemplary behavior in court and in jail, and

5   had twice voluntarily surrendered himself to the police on the charges.  Id.

6         During a break in jury selection, defense counsel raised an objection to the proximity of

7   the escort officer to petitioner.  2 RT 496-97.  He requested that the escort officer—who was

8   seated approximately two-and-a-half to three feet behind petitioner—"sit back and give us a little

9   space" because the proximity "sends a message to the jury that is prejudicial to the defense in this

10   case" and "the strong subliminal message a jury could take away from this is that [petitioner] is in

11   some way dangerous because there is an officer essentially sitting within arm's length."  Id.

12   Counsel argued that such close proximity was unnecessary because petitioner had no criminal

13   history, had exemplary behavior, and was not a flight risk, as evidenced by the fact that he self-

14   surrendered to the police on two separate occasions.  Id.

15         The court stated that it intended to ask the prospective jurors "whether an officer sitting

16   immediately behind Mr. Daniels will impact their ability to be fair and impartial" and that it

17   would inform them that the officer's presence was the standard operating procedure in the

18   courthouse.  2 RT 496-98.  The court further noted that there were different levels of security

19   depending on the defendant and the charges and that "[s]ometimes we have two escort officers,

20   sometimes they sit within six inches of the defendant or defendants."  2 RT 497.  Ultimately, the

21   court stated that the objections would be considered, "but at least right now, given the position of

22   this particular officer, I don't find that it is in any way oppressive or suggestive."  Id.

23         The court later advised the prospective jurors as follows:

24            I want to advise you, as you were already advised in the jury
              questionnaire, that Mr. Daniels is in custody.  This is not in any way
25            evidence of guilt and no inference of guilt should be made by any of
              you as a result of his being in custody.  Some people can afford bail
26            and some cannot.

27            Also, I want to advise you that the fact that an officer is sitting behind
              the defendant is of no consequence to you.  An officer is present in
28            every case in which a defendant is held in custody in this courthouse.

1
2

> It is standard operating procedure.  It is not in any way evidence of
> guilt and no inference of guilt should be made by any of you as a
> result of an officer being present.

3     1 Augmented RT 239.  The prospective jurors were then asked to raise their hand if petitioner

4     being in custody would impact their ability to be fair and impartial and no hands were raised.  Id.

5           B.   The Clearly Established Federal Law

6           The noticeable deployment of security personnel in a courtroom during trial is not an

7     inherently prejudicial practice that requires justification by an essential state interest specific to

8     each trial.  Holbrook v. Flynn, 475 U.S. 560, 568-69 (1986).  Due to "the variety of ways in

9     which such guards can be deployed," whether the presence of security was prejudicial must be

10    determined on a case-by-case basis.  Id. at 569.  In federal habeas proceedings, the court must

11    "look at the scene presented to jurors and determine whether what they saw was so inherently

12    prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged

13    practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the

14    inquiry is over."  Id. at 572.

15          C.   The State Court's Ruling

16          This claim was exhausted on direct appeal, and the last reasoned state court decision is the

17    opinion of the Court of Appeals.  That opinion is therefore the subject of review under § 2254(d).

18    Ortiz, 704 F.3d at 1034.

19          The state appellate court ruled in pertinent part as follows:

20
21
> Defendant argues the trial court prejudicially erred by having a
> uniformed officer sit about three feet behind defendant throughout
> the trial, without any individualized finding of necessity.  We
> disagree.

22
23
> A.  Background

24
> During a break in jury selection, defense counsel told the court:

25
26
> "I wanted to raise the issue of the position of the escort officer. I am
> mindful of the security issues.  But [defendant] comes to this case
> with no criminal history.  His behavior has been exemplary.  I am
> sure the court has noticed that.

27
28
> "I think that it is a problem when the escort officer is essentially right
> behind him, in front of the jury.  I don't think we have a problem
> with [defendant] doing anything inappropriate, and I would simply

67

ask that the court allow or order, whatever the appropriate terminology would be, that have the officer just sit back and give us a little space.

"I do feel that his being right behind us sets a bad—sends a message to the jury that is prejudicial to the defense in this case."

The trial court stated: "I do inform the jury, and I will as my standard procedure inquire of them as to whether an officer sitting immediately behind [defendant] will impact their ability to be fair and impartial.  I haven't done that yet just because we have just gotten started, but I will do that.  [¶]  I find that the officer now is maybe two and a half—I can't tell for sure—two and a half to three feet behind [defendant]; is that fair?"

Defense counsel agreed to the estimate and stated, "I don't think that it is necessary for him to be in such a direct proximity to [defendant].  I just don't think there is any security issue that really involves [defendant].  He is not going anywhere.  I would point out that in 2005 and in 2010 he self-surrendered to the officers when we—because I represented him both times—when we were made aware there was an allegation.  [¶]  He's not going anywhere.  He's here to fight for his innocence, and he's not going to do anything that would jeopardize his own case.  He has strong incentive to behave.  [¶]  I think the subliminal messages notwithstanding the Court's admonition to the jury, the strong subliminal message a jury could take away from this is that he is in some way dangerous because there is an officer essentially sitting within arm's length.  I just think in this particular case, with [defendant], that a little more space would be appropriate."

The trial court responded: "In terms of the security within the courthouse, of course we have different levels of security, depending on the nature of the particular defendant and the charges.  Sometimes we have two escort officers, sometimes they sit within six inches of the defendant or defendants.  [¶]  *I will consider this*, but at least right now, given the position of this particular officer, I don't find that it is in any way oppressive or suggestive.  [¶]  I will examine the panel with respect to that issue.  I always tell them it is standard operating procedure in the courthouse.  But your objection and comments are noted for the record."  (Italics added.)

The trial court told the panel, "I want to advise you that the fact that an officer is sitting behind the defendant is of no consequence to you.  An officer is present in every case in which a defendant is held in custody in this courthouse.  It is standard operating procedure.  It is not in any way evidence of guilt and no inference of guilt should be made by any of you as a result of an officer being present."  The trial court asked if defendant's being in custody would affect anyone's ability to be fair and impartial, got no response, but did not expressly inquire if the officer's presence would affect their ability to be fair and impartial.

B. <u>Analysis</u>

"Decisions to employ security measures in the courtroom are reviewed on appeal for abuse of discretion. [Citations.] [¶] Many courtroom security procedures are routine and do not impinge on a defendant's ability to present a defense or enjoy the presumption of innocence. [Citation.] However, some security practices inordinately risk prejudice to a defendant's right to a fair trial and must be justified by a higher showing of need. For example, visible physical restraints like handcuffs or leg irons may erode the presumption of innocence because they suggest to the jury that the defendant is a dangerous person who must be separated from the rest of the community. [Citations.] Because physical restraints carry such risks, their use is considered inherently prejudicial and must be justified by a particularized showing of manifest need. [Citations.]" (<u>People v. Hernandez</u> (2011) 51 Cal. 4th 733, 741-742 (<u>Hernandez</u>).)

But "the stringent showing required for physical restraints like shackles *is the exception, not the rule*. Security measures that are not inherently prejudicial need not be justified by a demonstration of extraordinary need." (<u>People v. Stevens</u> (2009) 47 Cal. 4th 625, 633 (<u>Stevens</u>), italics added.) Other security measures may not require such justification and instead reside in the sound discretion of the trial court. (<u>Id.</u> at pp.633-634.) "[F]or example, [ ] the presence of armed guards in the courtroom would not require justification on the record '[u]nless they are present in unreasonable numbers.' [Citations.] The United States Supreme Court also distinguishes between security measures, such as shackling, that reflect on defendant's culpability or violent propensities, and other, more neutral precautions.[n.23] Measures such a shackling or the appearance of the defendant in jail garb are inherently prejudicial and are subject to exacting scrutiny [citation], but precautions such as the use of additional armed security forces are not, because of 'the wider range of inferences that a juror might reasonably draw from the officers' presence.' . . . 'While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that [the] defendant is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance[n.24] from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status. Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm. [Citations.]'" (<u>People v. Jenkins</u> (2000) 22 Cal. 4th 900, 995-996.)

n.23 Citing <u>Holbrook v. Flynn</u> (1986) 475 U.S. 560, 569 [89 L. Ed. 2d 525].

n.24 In <u>Holbrook v. Flynn</u>, the court cited with approval a

69

federal case which found no abuse of discretion where the officer was seated three feet from the defendant.  (<u>Holbrook</u>, at p.569, citing <u>Hardee v. Kuhlman</u> (2d Cir. 1978) 581 F.2d 330, 332.)

The court in <u>Stevens</u> held that stationing a courtroom deputy next to the witness stand during the defendant's testimony was not an inherently prejudicial practice requiring justification by a showing of manifest need.  (<u>Stevens</u>, <u>supra</u>, 47 Cal. 4th at p.629.)  The <u>Stevens</u> court rejected the defendant's argument that the deputy's presence was akin to a "'human shackle.'"  (<u>Ibid.</u>)  The <u>Stevens</u> court cited with approval <u>People v. David</u> (1939) 12 Cal. 2d 639, 644 (<u>Stevens</u>, at p.634).  In <u>David</u>, the court rejected a similar argument where a sheriff and deputies accompanied the defendant into the courtroom, and one deputy followed the defendant inside the rail and took a seat immediately behind him.  The <u>David</u> court rejected the defendant's comparison to shackling and found nothing to show that the deputy's conduct prejudiced the defendant in any way.  (<u>David</u>, at p.644.)

The <u>Stevens</u> court stated, "so long as the deputy maintains a respectful distance from the defendant and does not behave in a manner that distracts from, or appears to comment on, the defendant's testimony, a court's decision to permit a deputy's presence near the defendant at the witness stand is consistent with the decorum of courtroom proceedings." (<u>Stevens</u>, <u>supra</u>, 47 Cal. 4th at p.639, fn. omitted.)

However, in the context of stationing a deputy next to a testifying defendant, the <u>Stevens</u> court cautioned that "the trial court must exercise its own discretion in ordering such a procedure and may not simply defer to a generic policy."  (<u>Stevens</u>, <u>supra</u>, 47 Cal. 4th at p.644.)  "The court may not defer decisionmaking authority to law enforcement officers, but must exercise its own discretion to determine whether a given security measure is appropriate on a case-by-case basis . . . .  [T]he trial court has the first responsibility of balancing the need for heightened security against the risk that additional precautions will prejudice the accused in the eyes of the jury.  'It is that judicial reconciliation of the competing interests of the person standing trial and of the state providing for the security of the community that, according to [United States Supreme Court precedent], provides the appropriate guarantee of fundamental fairness.'  [Citation.]  The trial court should state its reasons for stationing a guard at or near the witness stand and explain on the record why the need for this security measure outweighs potential prejudice to the testifying defendant.  In addition, although we impose no sua sponte duty for it to do so, the court should consider, upon request, giving a cautionary instruction, either at the time of the defendant's testimony or with closing instructions, telling the jury to disregard security measures related to the defendant's custodial status.  [Citation.]" (<u>Id.</u> at p.642.)

The <u>Stevens</u> court explained: "Any discretionary ruling must take into account the particular circumstances of the individual case and will be reviewed in that context.  However, if a practice is not inherently prejudicial, it need not be justified by a compelling case-

specific showing of need. [Citations.] . . . 'All a . . . . [reviewing] court may do in such a situation is look at the scene presented to the jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over.' [Citation.]" (Stevens, supra, 47 Cal. 4th at pp.637-638.)

Following Stevens, the California Supreme Court held in Hernandez, supra, 51 Cal. 4th 733 that the trial court abused its discretion in stationing a deputy at the witness stand during the defendant's testimony, based on routine security policy, but the error was harmless. (Id. at pp.744, 748.) The trial court stated a deputy always stands at the witness stand during a defendant's testimony in every case the judge had presided over, even in petty theft cases, and all defendants "'deserve'" to have a deputy stationed at the witness stand. (Id. at p.743.)

Since our Supreme Court has held there is no inherent prejudice when an officer shadows a defendant on the witness stand, then clearly there is no inherent prejudice when the officer sits through the trial a few feet behind the defendant at the defense table. Defendant does not contend the officer followed him to the witness stand.

Defendant argues that, even if the heightened standard does not apply, the trial court abuses its discretion when it orders heightened measures based on a standing practice without stating on the record the reasons why the need for that security measure outweighs the potential prejudice to the defendant.   Defendant quotes from Hernandez, supra, 51 Cal. 4th at page 744, "'Where it is clear that a heightened security measure was ordered based on a standing practice, the order constitutes an abuse of discretion, and an appellate court will not examine the record in search of valid, case-specific reasons to support the order.'"

However, there was no "heightened" security measure in this case. Furthermore, the trial court did consider this particular case.   The trial court said the court had different levels of security, depending on the nature of the particular defendant and the charges, and the level of security being used in this case was more relaxed than in other cases, where they sometimes have two escort officers or an officer sits within six inches of the defendant.

Additionally, defendant fails to show any actual prejudice.  As the Stevens court noted, "jurors have become accustomed to seeing security officers in public places such as the courtroom [citation], and there is a wide range of inferences they may draw from an officer's presence near a testifying defendant.  Because security officers are now 'ordinary and expected' in the courtroom [citation], jurors may view the sight of an officer accompanying the defendant to the witness stand as nothing more than a routine measure." (Stevens, supra, 47 Cal. 4th at p.638.) Here, the trial court actually informed the jury that the deputy's presence was routine. The court further admonished the jury that the deputy's presence was not

71

1

2

3

4

5

6

7

> evidence of guilt and that the jury was not to infer guilt from this circumstance.  Defendant does not claim or cite anything in the record to suggest that the deputy said or did anything that would brand him as a dangerous man.  While in its admonition, the trial court referenced that this routine practice takes place in every case where a defendant is in custody, given the allegations in the case and the involvement of parents who had placed their children in defendant's home, the jury could have thought the deputy's presence was just as much for defendant's protection or courtroom disturbances as for anything else.

> We conclude the trial court did not abuse its discretion and there was no prejudice.

8    Lodged Doc. 19 at 48-54 (alterations in original).

9               D.  Objective Unreasonableness Under § 2254(d)

10          There is no evidence that the presence of the officer during petitioner's trial was

11   inherently prejudicial.  The trial court explicitly instructed the jury that the officer's presence was

12   part of the court's routine procedures because petitioner was in custody and that the fact that

13   petitioner was in custody was "not in any way evidence of guilt and no inference of guilt should

14   be made."  1 Augmented RT 239.  The court further advised that "[s]ome people can afford bail

15   and some cannot," indicating that petitioner was in custody because he could not afford bail

16   rather than because he presented a danger.  Id.  There is no indication that the officer's presence

17   suggested particular concern or alarm as to petitioner's dangerousness—especially since he was

18   dressed in civilian clothing[22] and there is no indication or assertion that he was shackled in any

19   way—or that the officer acted in any way that would suggest petitioner was dangerous.

20   Additionally, given the nature of the charges against him, the jurors may have just as easily

21   believed the guard was there to protect petitioner from any disruptions in the courtroom.  See

22   Holbrook, 475 U.S. at 569.  In short, petitioner has failed to demonstrate that the presence of the

23   guard in this case was so inherently prejudicial as to pose an unacceptable threat to his right to a

24   fair trial.  See id. ("Our society has become inured to the presence of armed guards in most public

25   places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest

26

27   ─────────────

28
[22]  See 2 RT 645 (granting motion to allow petitioner to wear civilian clothes and be afforded daily shower and grooming supplies during trial and acknowledgment by petitioner that he had been allowed to do so up to that point despite the lack of an order from the court).

1  particular official concern or alarm." (citing Hardee v. Kuhlman, 581 F.2d 330, 332 (2nd Cir.

2  1978))); Hardee, 581 F.2d at 332 (no inherent prejudice where guard was stationed three feet

3  behind defendant who was wearing civilian clothes and had no handcuffs or other signs of

4  restraint). Finally, petitioner has failed to show that any of the jurors were actually influenced by

5  an officer being seated next to him. See Holbrook, 475 U.S. at 572 (must show actual prejudice if

6  practice was not inherently prejudicial).

7      For these reasons, petitioner fails to show that the state court adjudication of this claim

8  was an unreasonable application of clearly established federal law.

9  VI.    Claim Six: Cumulative Prejudice

10         A. Petitioner's Allegations and Pertinent State Court Record

11     Petitioner argues that the cumulative effect of the above errors was so prejudicial it

12 deprived him of due process. ECF No. 1-1 at 88-89.

13         B. The Clearly Established Federal Law

14     The combined effect of multiple trial court errors violates due process when it renders the

15 resulting criminal trial fundamentally unfair. Chambers v. Mississippi, 410 U.S. 284, 298 (1973).

16 The cumulative effect of multiple errors can violate due process even when no single error rises

17 to the level of a constitutional violation. Id. at 290 n.3.

18         C. The State Court's Ruling

19     On direct appeal, petitioner raised a cumulative error argument based upon the claims

20 found in Claims One, Two, Four, and Five of the instant petition. Lodged Doc. 20. The last

21 reasoned state court decision is the opinion of the Court of Appeals. That opinion is therefore the

22 subject of review under § 2254(d). Ortiz, 704 F.3d at 1034. The state appellate court ruled in

23 pertinent part that "Defendant maintains he was prejudiced by the cumulative effect of the

24 claimed errors. Having reviewed all contentions, we find no errors resulting in cumulative

25 prejudice." Lodged Doc. 19 at 54.

26     Petitioner's state habeas petition also raised a cumulative error claim based upon the

27 claims raised on direct appeal and the claims found in Claim Three of the instant petition.

28 Lodged Doc. 22. Because the California Supreme Court denied review without comment or

citation, the denial of the claim was on the merits.  Richter, 562 U.S. at 99; see also Williams, 568

U.S. at 301.  To the extent the cumulative error claim was expanded from that made on direct

appeal, there is no reasoned decision of a lower state court addressing this claim.

### D.  Objective Unreasonableness Under § 2254(d)

Because none of petitioner's individual substantive claims establish error, it was not

unreasonable of the state court to reject petitioner's original or expanded cumulative error claims.

See Ybarra v. McDaniel, 656 F.3d 984, 1001 (9th Cir. 2011) (petitioner not entitled to relief for

cumulative error where trial imperfections do not infect trial with unfairness in violation of due

process).

### CONCLUSION

For all the reasons explained above, the state courts' denial of petitioner's claims was not

objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).  Accordingly, IT IS

HEREBY ORDERED that petitioner's motion for a decision on his petition (ECF No. 27) is

GRANTED to the extent that findings and recommendations have now issued.

IT IS FURTHER RECOMMENDED that the petition for writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge

assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l).  Within twenty-one days

after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

he shall also address whether a certificate of appealability should issue and, if so, why and as to

which issues.  See 28 U.S.C. § 2253(c)(2).  Any reply to the objections shall be served and filed

within fourteen days after service of the objections.  The parties are advised that failure to file

objections within the specified time may waive the right to appeal the District Court's order.

Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: July 22, 2022

**ALLISON CLAIRE**
**UNITED STATES MAGISTRATE JUDGE**

74